Revised September 25, 2000

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

No. 99-30475

———————————

UNITED STATES FIDELITY & GUARANTY CO., et al.,

Plaintiffs,

UNITED STATES FIDELITY AND GUARANTY CO; FIDELITY & GUARANTY
INSURANCE CO; FIDELITY & GUARANTY INSURANCE UNDERWRITERS, INC;
ARGONAUT INSURANCE COMPANY; ARGONAUT MIDWEST INSURANCE COMPANY;
ARGONAUT SOUTHWEST INSURANCE COMPANY; COMMERCIAL UNION INSURANCE
COMPANY; AMERICAN CENTRAL INSURANCE; AMERICAN EMPLOYERS'
INSURANCE COMPANY; EMPLOYERS FIRE INSURANCE COMPANY; THE NORTHERN
ASSURANCE COMPANY OF AMERICA; UNITED STATES FIRE INSURANCE
COMPANY; NORTH RIVER INSURANCE COMPANY; INSURANCE COMPANY OF
NORTH AMERICA; BANKER'S STANDARD INSURANCE COMPANY; CENTURY
INDEMNITY CO; CIGNA FIRE UNDERWRITERS INSURANCE COMPANY; CIGNA
INSURANCE CO; CIGNA PROPERTY & CASUALTY INSURANCE COMPANY; CIGNA
SPECIALITY INSURANCE COMPANY; INDEMNITY INSURANCE COMPANY OF
NORTH AMERICA; PACIFIC EMPLOYERS INSURANCE COMPANY; HARTFORD
INSURANCE COMPANY; HARTFORD FIRE INSURANCE COMPANY; HARTFORD
INSURANCE COMPANY OF THE MIDWEST; HARTFORD INSURANCE COMPANY OF
THE SOUTHEAST; ]HARTFORD UNDERWRITERS INSURANCE COMPANY; TWIN
CITY FIRE INSURANCE COMPANY; TRAVELERS INSURANCE COMPANY;
TRAVELERS INDEMNITY COMPANY OF AMERICA; THE TRAVELERS INDEMNITY
COMPANY; THE TRAVELERS INDEMNITY COMPANY OF CONNECTICUT; THE
TRAVELERS INDEMNITY COMPANY OF ILLINOIS; CHARTER OAK FIRE
INSURANCE COMPANY; PHOENIX INSURANCE COMPANY; AETNA CASUALTY &
SURETY COMPANY; CIGNA INDEMNITY INSURANCE COMPANY; LIBERTY MUTUAL
INSURANCE COMPANY; LIBERTY MUTUAL FIRE INSURANCE COMPANY; LIBERTY
INSURANCE CORPORATION,

Plaintiffs-Appellants,

v.

W. FOX MCKEITHEN, etc., et al.,

Defendants,

**W. FOX McKEITHEN, Louisiana Secretary of State; KEN DUNCAN, Louisiana State Treasurer; GLYNN VOISIN, Judge, Director of Workers' Compensation of Louisiana; JAMES H. BROWN, Louisiana Commissioner of Insurance; MADLYN B. BAGNERIS, Secretary of Social Services of Louisiana, in their official capacities as members of the Louisiana Workers' Compensation Second Injury Board; CHRIS WEAVER, Acting Secretary, Louisiana Department of Labor,**

**Defendants-Appellees.**

---

**Appeal from the United States District Court for the Middle District of Louisiana**

---

September 15, 2000

Before JONES, DUHÉ, and WIENER, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Plaintiffs, United States Fidelity & Guaranty Company and various other private insurance companies, appeal the district court's summary judgment upholding a Louisiana statute that altered the funding formula for the Louisiana Workers' Compensation Second Injury Fund. Because, as applied to the plaintiffs, the statute in question violates the Takings Clause of the United States Constitution, we REVERSE the judgment and REMAND for further proceedings.

## I. BACKGROUND

In 1974, the Louisiana legislature established the Workers' Compensation Second Injury Fund ("SIF"). See 1974 La. Acts, No. 165, § 1 (the "1974 Act"). The SIF's stated purpose was

to encourage the hiring and retention of disabled workers. Under the previous workers' compensation system, an employee's current employer was responsible for payment of disability benefits even though the worker's disability was partly attributable to a prior accident or disability not involving the current employer. As a result, an employer faced higher insurance costs when hiring a previously disabled worker than it would for an able-bodied worker, and the hiring of previously-injured employees was concomitantly discouraged.

The SIF removed from the ordinary course of insurance an employer's hiring of previously-injured workers. Under the SIF, if an employer became liable to pay compensation to a disabled worker as a result of a second injury, the SIF reimbursed the employer (if the employer was self-insured) or the employer's workers' compensation insurer (if the employer was insured) for benefits paid to the employee. As designed, the SIF was cost-neutral to workers' compensation insurers while spreading the costs of second injury benefits among all employers in the State of Louisiana. This policy was implemented in two ways. First, when an injured worker filed a second injury claim with an insurer, the insurer paid the claim but obtained reimbursement from the SIF. The insurer was thus an intermediary, with the SIF serving as the ultimate payor of benefits. Claims for serial injuries no longer

3

formed part of an employer's loss profile on which its worker's compensation premiums were directly based.

Second, the insurer acted as a conduit through which the SIF passed on reimbursement costs and administrative expenses to insured employers. (The SIF assessed self-insured employers directly.) Under the 1974 Act, insurers were assessed a legislatively-fixed percentage of workers' compensation insurance premiums collected during the applicable year. See La. Rev. Stat. § 23:1377(B)(1974). Louisiana regulators interpreted the 1974 Act to allow insurers to pass these assessments on to employers by including them in the "expense component" of workers' compensation insurance rates. By including the assessment in the premiums billed to insureds, the insurers were reimbursed by employers, on a dollar-for-dollar basis. The assessments were ultimately borne by the employers proportionately, and the State of Louisiana thus avoided the administrative difficulties of collecting small assessments from thousands of insured employers. Insurers also collected lower premiums in recognition of the fact that they no longer covered the costs of workers' second injury claims. This system assured that insurers bore none of the SIF's costs and received no net benefit from the SIF.

In 1995, the Louisiana legislature enacted Act 188, which amended the 1974 Act. See 1995 La. Acts, No. 188 ("Act 188"), codified at La. Rev. Stat. §§ 23:1371-1378. Act 188 did not change

4

the purpose or organization of the SIF, but it did change the method of assessing insurers' annual contributions to the SIF. Instead of basing assessments on a percentage of premiums collected in Louisiana, Act 188 moved to a percentage of workers' compensation benefits paid by the insurer or self-insured in the previous calendar year. While the previous system based assessments on an insurer's current volume of transactions -- specifically, premiums collected under policies written contemporaneously with the assessment -- Act 188 predicates assessments on the insurer's volume of business written in earlier years.[1]

In addition to changing the SIF's assessment formula, Act 188 was made retroactive to insurance policies written before the Act's passage. Thus, Act 188 applies to any policy written before its effective date[2] if that policy resulted in the payment of

---

[1] According to the plaintiff insurance companies, there is typically a long gap, or tail, between the date of a policy's issuance and the date when a claim is paid under that policy. This "tail" exists for three reasons. First, workers suffering total or partial permanent disability are entitled to benefits for some years during which they would have had, but for the injury, an earnings capacity. Second, if an injury is fatal, workers' surviving family members are entitled to death benefits -- the worker's spouse until death or remarriage and any children until they reach the age of majority. Finally, occupational diseases such as asbestosis have long latency periods, and workers suffering from these diseases might not file claims until years or decades after exposure to the asbestosis or other disease-causing substance.

[2] Act 188 was effective June 12, 1995. La. Rev. Stat. § 23:1377.

5

benefits after the effective date.  Act 188 was also made expressly applicable to workers' compensation insurers who, prior to the Act's passage, had withdrawn from the Louisiana market or had substantially reduced their underwriting in the state.[3]

The plaintiffs represent the class of insurers that, prior to 1995, withdrew from the Louisiana market or substantially reduced their underwriting in the state.[4]  In April 1996, they initiated this action, alleging that application of Act 188 to pre-enactment insurance contracts violated the Takings Clause, the Contract Clause, and the Equal Protection Clause of the U.S. Constitution.  They named as defendants, in their official capacities, the members of the Louisiana Workers' Compensation Second Injury Board (the "Board"), the Louisiana Secretary of Labor, and the State's Commissioner of Insurance (collectively, the "state officials"), all of whom are responsible for implementing or

---

[3]    Act 188 provides that "[a]ny property and casualty insurer that has discontinued writing workers' compensation insurance in this State . . . shall continue to be liable for payment of any assessment to the [SIF] on account of any benefits paid."  La. Rev. Stat. § 23:1377(C)(2).

[4]    Two of the plaintiff families of affiliated companies, United States Fidelity & Guaranty Company and Crum & Forster (d/b/a U.S. Fire and North River) effectively withdrew from the Louisiana market.  The remaining plaintiffs substantially reduced their underwriting in the State.  For example, the plaintiffs offered evidence that one insurer reduced its premium volume from $62 million to $2 million from 1990 to 1994.  Another insurer reduced its volume from $88 million to $5 million during the same period, and another reduced its volume from $74 million to $8 million.

6

enforcing Act 188.[5]  The complaint sought declaratory and injunctive relief.

The parties filed cross-motions for summary judgment, and the case was referred to a magistrate judge, who recommended that the state officials' motion be granted on the Contract Clause and Equal Protection claims and that the plaintiffs' motion be granted on the Takings Clause claim.  After timely objections by the parties, the district court granted summary judgment in favor of the state officials on all claims and dismissed the case.

Plaintiffs now appeal the disposition of their Contract Clause and Takings Clause claims.[6]

## II.  DISCUSSION

The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation."  U.S. Const. amend V.[7]  The purpose of the Takings Clause is to prevent the government from "forcing some people alone

---

[5]    The complaint also named the Louisiana Attorney General as a defendant in his official capacity, but he was later dismissed by stipulation of the parties.

[6]    We review the district court's grant of summary judgment *de novo*. <u>Voting Integrity Project, Inc. v. Bomer</u>, 199 F.3d 773, 774 (5th Cir. 2000); <u>Norman v. Apache Corp.</u>, 19 F.3d 1017, 1021 (5th Cir. 1994).  As the facts are uncontested, the questions before us are those of law, including characterizing the legal effect of the facts.

[7]    The Fifth Amendment applies to the states through the Fourteenth Amendment.  <u>Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City</u>, 473 U.S. 172, 105 S.Ct. 3108, 3111 (1985).

to bear public burdens, which, in all fairness and justice, should be borne by the public as a whole." Eastern Enterprises v. Apfel, 524 U.S. 498, 522, 118 S.Ct. 2131, 2146 (1998), (quoting Armstrong v. United States, 364 U.S. 49, 49, 80 S.Ct. 1563, 1569 (1960)).

This case does not present a classic taking in which the government directly appropriates private property for its own use. See Eastern Enterprises, 524 U.S. at 522. Rather, the alleged taking arises from an economic regulation -- a "public program adjusting the benefits and burdens of economic life to promote the common good." Id., citing Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659 (1978). The inquiry into a challenged regulation's constitutionality involves an evaluation of the "justice and fairness" of the government action. Id. at 523. Although this inquiry involves no set formula and is necessarily *ad hoc* and fact intensive, the Supreme Court has identified three factors of "particular significance" to a regulatory takings clause analysis: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with reasonable investment-backed expectations; and (3) the character of the government action. Id. at 523,24, citing Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 224-25, 106 S.Ct. 1018, 1026 (1986).

It must be acknowledged that a plaintiff bears a substantial burden in proving that government action inflicts an

unconstitutional taking.  See United States v. Sperry Corp., 493

U.S. 52, 60 (1989).  Further, the complexity of the issue manifests

itself in the variety of relevant Supreme Court decisions.  See,

e.g., Eastern Enterprises, 524 U.S. at 541-42 (KENNEDY, J.,

concurring in the judgment and dissenting in part and citing

numerous cases).  Nevertheless, a review of the justice and

fairness of Act 188 in light of the three listed factors leads to

the same conclusion reached by the magistrate judge: as applied to

the plaintiffs' insurance contracts entered into before the law's

effective date, Act 188 unconstitutionally takes the plaintiffs'

property without just compensation.[8]

A.  Economic Impact

In examining the economic impact of Act 188, not only the

financial burden it imposes but also the proportionality between

that burden and the insurers' experience with the SIF must be

considered.   See  Eastern  Enterprises,  524  U.S.  at  530.

Additionally relevant are any parts of Act 188 by which plaintiffs

can "moderate and mitigate" the economic impact.  Id., 524 U.S. at

527.

There is no doubt that Act 188 imposes a considerable,

novel financial burden on the plaintiffs.  Under the SIF funding

scheme established by the 1974 Act, insurers paid a net amount of

---

[8]     Because we invalidate Act 188 as applied to plaintiffs
under the Takings Clause, we will pretermit and express no opinion
on the plaintiffs' Contract Clause claim.

9

zero for claims made on the Second Injury Fund and collected SIF premiums from their insureds only to pass-through the SIF assessments. In contrast, Act 188 charges insurers based on benefits paid under insurance policies written before the law's effective date, and it affords these plaintiffs no means to recoup the charge. Insurers that have maintained a substantial presence in the Louisiana market can still pass the cost of these assessments to their insureds. But plaintiff insurers that have discontinued writing policies in Louisiana charge no ongoing premiums in the State through which the assessments can be passed. Likewise, plaintiff insurers that have substantially reduced their volume of business cannot, as a practical matter, pass the assessments through to employers; their reduced premium base would require uncompetitively high rates that would drive them out of the market.[9] The magistrate judge found that Act 188 cost the plaintiffs $5 million in 1995, and plaintiffs themselves estimate without contradiction that Act 188 will cost them $45 million in the future. These sums represent a substantial liability. See Eastern Enterprises, 524 U.S. at 529-32 (finding a substantial economic impact where the plaintiff had been assessed $5 million in one year and faced even greater future liabilities).

---

[9] These plaintiffs' evidence that they would have to raise rates to noncompetitive levels to pass on the costs of the new assessments went uncontradicted by defendants.

10

The defendants contend, however, that plaintiffs have suffered no negative impact because plaintiffs in 1995 received a total reimbursement benefit of over six million dollars thanks to Act 188. This is specious. The reimbursement touted by defendants did not cover the assessments now paid by the plaintiff insurers. Even after the passage of Act 188, insurers or self-insured employers continue to be reimbursed by the SIF for the benefits they have paid to reinjured workers. The fundamental structure of the SIF has not been altered, but the imposition of part of its cost upon insurers without opportunity for pass-through is new.

In essence, the State of Louisiana is the troll under the bridge, extracting money from businesses whose sole activity is sending money into the state. This amounts to a transfer of plaintiffs' assets to the state or to third parties for public use.

The newly-created liability reflects no proportionality to the plaintiffs' experience with the SIF. For over twenty years before Act 188, plaintiffs were an intermediary for the SIF. They collected assessments from employers and received SIF reimbursement for payment of second injury benefits. They received no net benefits and incurred no net costs. Defendants do not argue that the policy and purpose of the SIF have changed since its inception in 1974. But under Act 188, plaintiffs must make significant net contributions to the fund. Act 188 thus imposes costs on parties that never profited from the SIF.

11

Defendants argue that the plaintiffs are still receiving SIF reimbursement even though, if Act 188 is invalidated, they would no longer be paying assessments to SIF. Again, defendants ignore that, under both the 1974 and 1988 Acts, entitlement to reimbursement arises from payment of second injury benefits, not from assessments. The purpose of the SIF program has consistently been to remove the direct cost of serial injuries from the risk-adjusted insurance market and to replace it by pay-as-you go funding. Even the insurers that no longer do business in Louisiana incur no windfall from this program, as they receive no net profit from SIF reimbursements and never in the past collected premiums for the risk of second injuries.

Defendants also fail to show that plaintiffs could have mitigated or moderated the impact of Act 188. Act 188 offered no gradual phase-in period. If plaintiffs refuse to pay the assessments, they are subject to substantial penalties, including a civil penalty equal to 20 percent of the amount assessed but unpaid. Though defendants suggest that plaintiffs could choose to write more workers' compensation policies in the state, the mitigating measures must be found in the challenged regulation itself. See Connolly, 475 U.S. at 226 (finding that the challenged statute itself contained provisions by which the plaintiff could mitigate liability).

12

B.  Interference with Reasonable Investment-Backed Expectations

Retroactivity is generally disfavored in the law.  See Eastern Enterprises, 524 U.S. at 532, 118 S.Ct. at 2131 (citing Bowen v. Georgetown Univ. Hospital, 488 U.S. 204, 208, 109 S.Ct. 468, 469-70 (1988)).  Retroactive legislation, as opposed to the prospective kind, can  present more severe problems of unfairness because it can upset legitimate expectations and settled transactions.  See General Motors Corp. v. Romein, 503 U.S. 181, 191, 112 S.Ct. 1105, 1112 (1992).

The magistrate judge found that Act 188's retroactive application reached back at least twenty years to upset the plaintiffs' reliance on the cost-neutrality of the 1974 funding scheme.  We agree.[10]

Defendants do not dispute the extent of the reach-back.  Instead, they assert that the companies' alleged economic expectations are unreasonable because the insurance industry is heavily regulated and because the plaintiffs knew of the SIF's need for annual funding and knew that benefits-based assessments are prescribed in many other states.

None of these factors -- extensive regulation, SIF's pay-as-you-go status, or other states' policies -- made it objectively

---

[10]    The district court erred in finding that Act 188 did not operate retroactively.  In changing the assessment formula for contracts written before its effective date, Act 188 attaches new legal consequences to past acts.  This is the very definition of retroactivity.  See Landgraf v. USI Film Products, 511 U.S. 244, 269 n. 23, 114 S.Ct. 1483, 1499 n. 23 (1994).

13

reasonable to expect that Louisiana would decide to shift the cost of funding the SIF from in-state employers to insurers who had withdrawn, wholly or partly, from writing insurance in Louisiana and who could not recoup the costs of this forced underwriting. While plaintiffs might have been on notice that there could be a change away from premium-based assessments, there was no evidence that the plaintiffs should have suspected abandonment of cost-neutrality.[11]  There was no evidence that the cost of financing the SIF was ever intended to be borne by insurers, that there existed any rationale or policy for imposing the cost on insurers, or that the state was contemplating shifting the burden of funding onto insurers.

And while the majority of states do not use the premium-based assessment method for their SIF's, and that method might have posed certain administrative problems for Louisiana, insurers could hardly have foreseen the retroactive imposition of a benefits-based method.

Finally, the mantra that insurance is a regulated industry will not cover all sins of retroactivity.  The coal

---

[11]  Indeed, if cost-neutrality is abandoned, Louisiana must afford insurers some way to recoup the costs of their underwriting of second injury claims.  Otherwise, the state would be requiring the insurers to bear a burden imposed on no other part of society. Insurers could then easily decide to withdraw from the state en masse rather than accept this burden.  It is not an accident that Louisiana thus decided to abandon cost-neutrality only as to a few insurers who had already substantially abandoned new underwriting there.

industry had been heavily regulated with respect to miners' health benefits, but the Supreme Court was not persuaded that the retroactive liability in Eastern Enterprises could have been anticipated.  See Eastern Enterprises, 524 U.S. at 534-36.  Here, Louisiana's abandonment of cost-neutrality has shifted onto these plaintiffs -- for the first time -- costs attributable to the SIF. Contrary to the state's contention, the insurers did not have a stake in the SIF that would justify a reasonable expectation that they might be required to subsidize it.  Insurers are only one tiny group among the employers who formerly shared the cost of the SIF. More important, because the fund was cost-neutral to them, they never received a net benefit from it.  Except for reasons of administrative convenience, the SIF was intended to be a non-insurance-based compensation program.  Regulation of the insurance business was actually extended in a novel way when Act 188 imposed non-reimbursable assessments on these plaintiffs.

In short, there was no pattern of conduct on the state's part that could have given the plaintiffs sufficient notice that cost-neutrality would end.  See Eastern Enterprises, 524 U.S. at 498 (examining the government's pattern of involvement in the regulated field in order to determine whether plaintiff had sufficient notice of the challenged regulation).

The magistrate judge also found, and we agree, that the defendants failed to show an adequate justification for the

15

retroactive application of Act 188. There are no indications in the law itself, in the legislative history, or in the record of this case that the SIF was financially insecure, or that employers were having trouble bearing the costs of operating the SIF. Defendants justified Act 188 by relying on evidence of administrative difficulties in computing premium-based assessments for self-insureds, but they do not explain how retroactive application of Act 188 helps to alleviate this problem.

C. Nature of the Government Action

The district court found that Act 188 was "a rational attempt by the state to impose the costs inherent in a certain type of business activity on those who have profited from the fruits of the business in question." This characterization, as has been repeatedly explained, is wrong. Insurers were perhaps the only party that did not benefit from the 1974 SIF funding scheme. Employers profited from the creation of the SIF because the costs of second-injury benefits were spread across all employers. Workers, especially disabled workers, profited because the SIF made it cheaper to hire them. The State of Louisiana profited because the SIF furthered state policy on the employment of disabled workers. But insurers did not profit from the SIF, though neither did they suffer any detriment.

The district court also erred in finding that Act 188 provides for "just compensation." Act 188 does not prohibit

16

insurers from recovering the costs of assessments through the rate-making process, but the district court overlooked that plaintiffs cannot avail themselves of the rate-making process. As applied to the plaintiffs' pre-enactment contracts, the statute does not provide "just compensation."

The nature of the government action here is thus unusual. Without identifying a compelling problem, such as the financial insecurity of the SIF, the state enacted a solution that "singles out certain [parties] to bear a burden that is substantial in amount, based on the [parties'] conduct far in the past, and unrelated to any commitment that the [parties] made or to any injury they caused . . . ." Eastern Enterprises, 524 U.S. at 537.

### III. CONCLUSION

A final word is in order about the controlling caselaw. We have applied principles espoused in a series of Supreme Court cases, each of which goes out of its way to emphasize the fact-specific nature of a Takings Clause decision. See, e.g., Eastern Enterprises, 524 U.S. at 523; Connolly, 475 U.S. at 224. While Eastern Enterprises seems factually closest to this case -- because of its long period of retroactivity, the imposition of unforeseen liability, and application to companies no longer in the market -- its takings clause rationale was accepted by only four justices, with Justice Kennedy concurring on a due process basis. See Eastern Enterprises, 524 U.S. at 539 (KENNEDY, J., concurring in the

17

judgment and dissenting in part). Insofar as Justice Kennedy's specific dispute with the rest of the majority rested on the extent to which a regulatory taking must refer to an identifiable property interest or fund, we believe that dispute would be muted -- or mooted -- here. The assessments against these plaintiffs arise from the specific fund of benefits they pay to claimants in Louisiana each year. Further, the assessments are charged by the insurers against the fund of reserves set aside from the premiums collected under specific insurance policies. Otherwise, Justice Kennedy's due process analysis focuses on retroactivity and is essentially harmonious with the reasoning of the other four justices. See id. at 547-50 (KENNEDY, J., concurring in the judgment and dissenting in part).

The defendants rely on Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 106 S.Ct. 1018 (1986), as the closest-fitting case to this one. In Connolly, however, the Court noted that employers were continuously aware, during the entire period of retroactivity, not only that Congress was studying the funding mechanism for multiemployer pension plans but also that statutory withdrawal liability might be required. See Connolly, 475 U.S. at 226-27. In addition, the employers in Connolly were held responsible for pension plans for their employees or employees subject to multiemployer plans, see id. at 225. These plaintiffs, having previously been mere conduits for payments from and

18

assessments to the SIF, are uniquely being forced to defray the cost of the SIF for other people's employees.  Finally, there was rough proportionality in <u>Connolly</u> between an employer's assessment and its experience with the plan to which it had contributed, and provisions of the retroactive law moderated and mitigated its potential unfairness.  <u>See</u> <u>id</u>. at 225-26.  No such proportionality or mitigation exists in this case.

Act 188 as applied to plaintiffs' pre-enactment contracts retroactively imposes a heavy economic burden on those who could not reasonably anticipate the liability.  The extent of the liability is disproportionate to the plaintiffs' experience with the SIF, and the legislation is unnecessary to substantially advance a legitimate state interest.  <u>See</u> <u>Eastern Enterprises</u>, 524 U.S. at 528-29.  To this extent, the statute effects an unconstitutional taking of plaintiffs' property without just compensation.  The judgment of the district court is **REVERSED**, and the case is **REMANDED** for entry of appropriate injunctive relief.

**REVERSED** and **REMANDED**.