[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 07-15886
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DEC 3, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 05-00871-CV-J-16-TEM

SWISHER INTERNATIONAL, INC.,

Plaintiff-Appellant,

versus

ED SCHAFER,
Secretary of Agriculture,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(December 3, 2008)**

Before ANDERSON, BARKETT and COX, Circuit Judges.

ANDERSON, Circuit Judge:

Swisher International, Inc. ("Swisher") appeals the district court's grant of summary judgment in favor of Edward T. Schafer, Secretary of Agriculture (the "Secretary").[1] Swisher alleged that the Fair and Equitable Tobacco Reform Act of 2004, 7 U.S.C. §518 et seq. (the "Act") and its implementing procedures violate the Takings and Due Process Clauses of the Fifth Amendment and Swisher's constitutional right to equal protection. The Act transforms the heavily regulated and subsidized tobacco production system into a free market system. As part of the transition process, the Act provides a buyout for tobacco farmers and tobacco quota holders. The buyout is funded through quarterly assessments levied on tobacco manufacturers and importers selling tobacco products in the domestic market. Swisher believes that these assessments violate the Constitution. We have determined that the Takings Clause does not apply to Swisher's mere obligation to pay an assessment. We hold that Swisher's obligations under the Act do not violate the Due Process Clause or Swisher's equal protection rights. We affirm the district court's summary judgment in favor of the Secretary.

## I. BACKGROUND

In 1938, Congress began regulating tobacco growers by establishing a

---

[1] Edward T. Schafer has been substituted as the appellee because he replaced former Secretary Mike Johanns, the named defendant in the district court opinion.

system of quotas and price supports. The price support system was managed by the Commodity Credit Corporation ("CCC"). The type of tobacco used in the production of cigarettes has been the historical focus of the price support system. Swisher, as a cigar manufacturer, purchased less than one percent of its tobacco through the price support system in 1999-2004, averaging 0.031% percent of the total tobacco sold through the program in each year.

When the CCC began to sustain losses as a result of operating the program, Congress required tobacco importers, buyers, and producers to make payments to a fund that covered the losses. By the early part of this century, Congress determined that the price support system was no longer in the best interest of the industry. In 2004, the President signed into law the Fair and Equitable Tobacco Reform Act, 7 U.S.C. § 518 et seq. The Act dismantled the tobacco quotas and price supports that had been in place since 1938 and created a program to help tobacco farmers make the transition to a free market system. The Act works as a buyout of tobacco growers, taking place over ten years and financed by payments from tobacco manufacturers and importers.[2]

---

[2] The Act also relieves cigarette manufacturers of some of their liability under a settlement agreement with 47 state attorneys general regarding recovery of health care costs related to smoking. The settlement agreement provided that settlement payments would be cancelled on a dollar-for-dollar basis if the federal government enacted an industry-funded tobacco grower buyout.

Under the Act, the Department of Agriculture determines the assessments owed by each manufacturer using a two-step process. First, the total yearly assessment is divided among six classes of tobacco manufacturers (cigarettes, cigars, snuff, roll-your-own, chewing tobacco, and pipe tobacco), based on their market share in the preceding calendar year quarter. 7 U.S.C. §518d(b)(1), (e)(1). The percentage of the total yearly assessment for which each class is responsible was statutorily established for fiscal year 2005, but the Secretary has the authority to adjust the percentages in subsequent years. Id. §518d(c)(1)-(2). The market share for each class is determined by multiplying each class's tobacco volume by the excise taxes paid by that class in the prior year. 7 C.F.R. §§1463.3, 1463.4. For all classes of tobacco except cigars, the actual excise tax rates are used to calculate market share. Id. §1463.7(c). Because the excise tax rate for cigars varies, the market share for cigar manufacturers is calculated using the maximum excise tax rate and the number of units sold. Determination of the market share of each tobacco class is referred to as "Step A."

Once the market share for each class has been determined, the Secretary allocates the percentage of the total assessment owed by each class among individual manufacturers and importers. 7 C.F.R. §1463.7(d). For cigarette and cigar sellers, the individual assessments are determined by the number of cigarettes

4

and cigars sold. 7 U.S.C. §518d(g)(3)(A). For the remaining classes of tobacco products, the number of pounds of tobacco is used to determine the assessments. Id. §518d(g)(3)(B). This determination is referred to as "Step B."

Swisher paid $11 million in the first year of the program. Swisher anticipates its total assessments over the ten years will be in excess of $100 million. In 2005, Swisher filed suit against the Department of Agriculture, challenging the constitutionality of the Act. The district court granted summary judgment in favor of the Secretary, and Swisher now appeals.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. Holloman v. Mail-Well Corp., 443 F.3d 832, 836 (11th Cir. 2006). Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of fact and compels judgment as a matter of law. Fed. R. Civ. P. 56(c); Holloman, 443 F.3d at 836.

## III. DISCUSSION

Both parties rely upon Eastern Enterprises v. Apfel, 524 U.S. 498, 118 S. Ct. 2131 (1998). We agree that Eastern Enterprises and its progeny provide significant guidance for this case. Thus, we first analyze that case to arrive at a rule of decision for this case. Then we determine whether Swisher's rights were violated

under the Due Process Clause of the Fifth Amendment. Finally, we determine whether the methodology for apportioning the assessments violates Swisher's equal protection rights under the Fifth Amendment.

A.  Analysis of Eastern Enterprises and Determination of a Rule of Decision for this Case

In Eastern Enterprises, the Supreme Court considered challenges to the Coal Industry Retiree Health Benefit Act of 1992 ("Coal Act") under the Due Process and Takings Clauses of the Constitution. 524 U.S. at 503-04, 118 S. Ct. at 2137 (plurality opinion). The Coal Act assigned retirees to previous employers according to a statutory formula, requiring the employers to pay premiums into the Combined Fund to cover benefits for the retirees. Id. at 514-15, 118 S. Ct. at 2141-42. By 1965, Eastern had transferred all of its coal-related operations to a subsidiary and was no longer involved in the industry. Id. at 516, 118 S. Ct. at 2143. Following the Coal Act's enactment, Eastern was assigned the obligation for premiums regarding over 1,000 retired miners who had worked for the company before 1966, with the premiums for a 12-month period exceeding $5 million. Id. at 517, 118 S. Ct. at 2134. Eastern asserted that the Coal Act violated substantive due process and constituted a taking of its property. Id.

1.  Justice O'Connor's plurality opinion concluded that application of the Coal Act to Eastern violated the Takings Clause

6

The plurality applied the Takings Clause and concluded "that the Coal Act's allocation of liability to Eastern violates the Takings Clause, and . . . should be enjoined as applied to Eastern." Id. at 538, 188 S. Ct. at 2153. The case did not involve a classic taking in which private property is taken by the government for its own use. Id. at 522, 118 S. Ct. at 2146. Although not the traditional takings model, the plurality asserted that economic regulation such as the Coal Act can amount to a taking. Id. at 522-23, 118 S. Ct. at 2146. The party challenging a governmental action as a taking has a heavy burden because government regulations often curtail some use of private property, and not every destruction of property is a taking in the constitutional sense. Id. at 523, 118 S. Ct. at 2146.

"[T]he process for evaluating a regulation's constitutionality involves an examination of the 'justice and fairness' of the governmental action." Id. The inquiry is essentially ad hoc and fact intensive, and the Court has found three factors to have particular significance: "[T]he economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action." Id. at 523-24, 118 S. Ct. at 2146 (alteration in original). The plurality noted that its prior decisions give Congress a lot of leeway to create economic legislation, including the power to impact contracts between parties and to impose a certain degree of retroactive legislation. Id. at 528, 118 S.

7

Ct. at 2149. However, the plurality stated that its decisions "left open the possibility that legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of the liability is substantially disproportionate to the parties' experience." Id. at 528-29, 118 S. Ct. at 2149.

The plurality determined—by applying the three factor test used in regulatory takings analysis—that the Coal Act's allocation scheme, as applied to Eastern, constituted a taking. Id. at 529, 118 S. Ct. at 2149. In discussing the first factor, economic impact, the plurality concluded that there was no doubt that the Coal Act placed a significant financial burden on Eastern. Id. Eastern's cumulative payments under the Coal Act were estimated to be between $50 and $100 million. Id. The plurality indicated "that an employer's statutory liability for multiemployer plan benefits should reflect some proportion[ality] to its experience with the plan." Id. at 530, 118 S. Ct. at 2149 (alteration in original) (internal quotations omitted). Eastern's liability under the Coal Act was based solely on its previous employees from 30 to 50 years before the enactment of the Act, "without any regard to responsibilities that Eastern accepted under any benefit plan the company itself adopted." Id. at 531, 118 S. Ct. at 2150.

With respect to the second factor, the plurality determined that "the Coal Act

substantially interfere[d] with Eastern's reasonable investment-backed expectations." Id. at 532, 118 S. Ct. at 2151. "Retroactivity is generally disfavored in the law . . . ." Id. The legislation reached back between 30 to 50 years to impose liability on Eastern based on prior actions. Id. Although the Act only mandated the payment of future benefits, it attached new liability based on an employment relationship that had terminated long before the Act's enactment. Id. Retroactive legislation brings up "fundamental notions of justice" and issues of fairness "because it can deprive citizens of legitimate expectations and upset settled transactions." Id. at 532-33, 118 S. Ct. at 2151. The Coal Act's retroactive liability is particularly far-reaching, "divesting Eastern of property long after the company believed its liabilities under" its prior agreement had been settled. Id. at 534, 118 S. Ct. at 2152. Substantial questions of fairness are raised by reaching so far into the past to impose liability. Id. Although Congress' attempt to protect miners was noble, "the Constitution does not permit a solution to the problem of funding miners' benefits that imposes such a disproportionate and severely retroactive burden upon Eastern." Id. at 536, 118 S. Ct. at 2153.

Regarding the third factor, the plurality determined that "the nature of the governmental action in this case [was] quite unusual." Id. at 537, 118 S. Ct. at 2153. Congress sought to find a legislative remedy to the major problem of

9

funding for miners' benefits; however, the solution singled out Eastern based on its conduct far in the past, and without any relationship to any commitment made by the employers or any injury Eastern caused. Id. The governmental action was problematic in regards to "fundamental principles of fairness underlying the Takings Clause." Id. The plurality concluded that, under the specific facts of the case, application of the Coal Act to Eastern was an unconstitutional taking. Id. The plurality acknowledged that there was a correlation between the analysis under the Takings and Due Process Clauses, but O'Connor noted the Court's "concerns about using the Due Process Clause to invalidate economic legislation." Id.

2.      Justice Kennedy's concurrence concluded that application of the Coal Act to Eastern was unconstitutional under the Due Process Clause

Justice Kennedy concurred in the judgment. Id. at 538, 118 S. Ct. at 2154 (Kennedy, J., concurring in the judgment and dissenting in part). However, Justice Kennedy argued that the plurality was wrong to conclude that the Coal Act took property because the regulation was without regard to property. Id. at 540, 118 S. Ct. at 2154. The Coal Act did not operate on or alter an identified property interest, and it was not measured by property interests. Id. "The law simply imposes an obligation to perform an act, the payment of benefits," and to the extent that the regulation affects property interests, it is similar to many laws that have never

10

before been considered takings.  Id.  Kennedy reasoned that, because "the constitutionality of the Coal Act appears to turn on the legitimacy of Congress' judgment rather than on the availability of compensation, . . . the more appropriate constitutional analysis arises under general due process principles rather than under the Takings Clause."  Id. at 545, 118 S. Ct. at 2157 (citation omitted).

Justice Kennedy concluded that principles forbidding retroactive legislation were sufficient to show that there was a violation of the Due Process Clause.  Id. at 547, 118 S. Ct. at 2158.  Although the Court has been hesitant to subject economic legislation to due process analysis, the Court has been willing to look more closely with regard to retroactive legislation.  Id.

Due process analysis requires an inquiry into whether the legislature acted in an arbitrary and irrational way in enacting the retroactive law.  Id.  Although prospective legislation carries a presumption of constitutionality, that does not mean that Congress can automatically legislate retroactively that which it could have legislated prospectively.  Id. at 547-48, 118 S. Ct. at 2158.  "Both stability of investment and confidence in the constitutional system . . . are secured by due process restrictions against severe retroactive legislation."  Id. at 549, 118 S. Ct. at 2159.

Justice Kennedy concluded that the case represented "one of the rare

11

instances where the Legislature . . . exceeded the limits imposed by due process."
Id.  The remedy in the Coal Act, as applied to Eastern, "bears no legitimate relation to the interest which the Government asserts in support of the statute." Id.  The unprecedented scope of retroactivity was a significant determinant in the unconstitutionality of the statute. Id.  Liability of former employers has been upheld when the statutes were remedial, but this statute was not remedial because Eastern was not responsible for the expectation of lifetime health benefits for retired miners. Id. at 550, 118 S. Ct. at 2159.  The expectation of lifetime benefits was created by agreements made long after Eastern had left the coal business. Id.  This case represented the rare instance in which the severe retroactive application of legislation is so egregious as to violate the due process clause. Id.[3]

> 3.      Is either the plurality opinion or Justice Kennedy's concurrence controlling?

As indicated above, the decision in Eastern Enterprises constitutes a fragmented decision in which the five Justices concurring in the judgment did not agree upon a single rationale to explain the result.  In such a case, "the holding of

---

[3]      The four dissenters agreed with Justice Kennedy that due process, rather than takings, was the appropriate framework for analysis.  They held: "The Constitution's Takings Clause does not apply." Id. at 554, 118 S. Ct. at 2161 (Breyer, J., dissenting).  This is so, according to the dissent, because the Takings Clause is primarily concerned not with "preventing arbitrary or unfair government action, but with providing compensation for legitimate government action that takes 'private property' to serve the 'public' good." Id.

the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds." Marks v. United States, 430 U.S. 188, 193, 97 S. Ct. 990, 993 (1977).

We note that the Supreme Court has commented that the Marks inquiry "has so obviously baffled and divided the lower courts." Nichols v. United States, 511 U.S. 738, 746, 114 S. Ct. 1921, 1927 (1994); see also Grutter v. Bollinger, 539 U.S. 306, 325, 123 S. Ct. 2325, 2337 (2003). Courts of appeal have applied several different formulations of the Marks rule. Although this Court has recently applied one particular formulation, United States v. Robison, 505 F.3d 1208, 1219-22 (11th Cir. 2007),[4] we need not in this case apply any particular formulation. This is so because Justice O'Connor's opinion for the plurality in Eastern Enterprises would not constitute binding authority (i.e., would not constitute the narrower ground) under any of the several formulations of the Marks inquiry.[5] We need not decide

---

[4]     In Robison, we addressed the "narrowest ground" of the five Justice majority opinion in Rapanos v. United States, 547 U.S. 715, 126 S. Ct. 2208 (2006). The issue in Rapanos and Robison involved the definition of "navigable waters" which in turn determined the jurisdiction of the Clean Water Act. We held that the narrowest ground was the least far-reaching: "The issue becomes whether the definition of 'navigable waters' in the plurality or concurring opinions in Rapanos was less far-reaching (i.e., less restrictive of CWA jurisdiction)." Robison, 505 F.3d at 1221. Because Justice Kennedy's test would "classify a water as 'navigable' more frequently than Justice Scalia's test," we determined that Justice Kennedy's test constituted the "narrowest grounds," the one less restrictive of the application of the federal statute, and thus constituted the binding rule of decision for Robison. Id. at 1221-22.

[5]     Under the formulation applied in Robison, it is probable that Justice Kennedy's concurring opinion in Eastern Enterprises, and not Justice O'Connor's plurality opinion, would

13

whether Justice Kennedy's concurrence constitutes the narrower ground, because

we can assume arguendo that neither opinion constitutes the narrower ground, thus

leaving us without binding authority, and leaving us with the obligation to

be considered the narrower of the two standards.  It is probable that his standard would be less far-reaching, i.e., less restrictive of the application of the federal Coal Act legislation.  In other words, especially in light of the extremely high threshold that courts require before finding a substantive due process violation, it is probable that Justice Kennedy's standard would less frequently result in a conclusion that the Coal Act was unconstitutionally applied.  See Eastern Enterprises, 524 U.S. at 542, 118 S. Ct. at 2155 (Kennedy, J., concurring in the judgment and dissenting in part) (noting that the plurality's opinion "would expand an already difficult and uncertain rule to a vast category of cases not deemed, in our law, to implicate the Takings Clause. . . .  The plurality opinion would throw one of the most difficult and litigated areas of the law into confusion, subjecting States and municipalities to the potential of new and unforeseen claims in vast amounts.").   Whether or not Justice Kennedy's concurrence is the narrower ground under the Robison formulation, a matter that we need not and do not decide in this case, we are confident that Justice O'Connor's plurality opinion is not the narrower ground, and thus is not binding precedent.

Other courts of appeal have held that neither Justice O'Connor's plurality opinion nor Justice Kennedy's concurrence are binding, because neither can meaningfully be regarded as "narrower" than the other, neither opinion being a logical subset of the other.  Thus no common denominator can be said to exist commanding the support of five Justices concurring in the judgment.  United States v. Alcan Aluminum Corp., 315 F.3d 179, 189 (2d Cir. 2003); Anker Energy Corp. v. Consol. Coal Co., 177 F.3d 161, 169-70 (3d Cir. 1999); Ass'n of Bituminous Contractors, Inc. v. Apfel, 156 F.3d 1246, 1254-55 (D.C. Cir. 1998).  Under these cases, neither opinion is binding, and thus under this formulation, Justice O'Connor's plurality opinion would of course not be binding.

Other courts of appeal have indicated that they are bound to follow the five Justices in Eastern Enterprises who concluded that the takings analysis was not appropriate; therefore, those courts applied substantive due process.  Those courts of appeal rely upon the fact that Justice Kennedy and the four dissenting Justices all indicated that a takings analysis was not appropriate. See Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1339 (Fed. Cir. 2001) (en banc); Parella v. Ret. Bd. of R.I. Employees' Ret. Sys., 173 F.3d 46, 58 (1st Cir. 1999).  Of course, this latter formulation is inappropriate in this circuit, the law of our circuit being clear that a combination of five Justices, some in the majority and some in the dissent, does not constitute binding precedent.  See Robison, 505 F.3d at 1221.  In any event, under none of the foregoing formulations would Justice O'Connor's plurality opinion in Eastern Enterprises constitute binding precedent.

14

independently evaluate the case law and determine for ourselves which approach is more consistent with the case law and more plausible. As elaborated below, our independent evaluation leads us to conclude that the takings analysis is not appropriate for this case.

Our independent evaluation of the case law leads us to agree with Justice Kennedy that the takings analysis is not an appropriate analysis for the constitutional evaluation of an obligation imposed by Congress merely to pay money. In the Supreme Court case, Eastern Enterprises challenged the power of Congress to require that it contribute to the funding of heath care benefits for retirees in the coal industry, a mere obligation to pay money. Similarly, in the instant case, Swisher challenges the power of Congress to impose upon it assessments under the Fair and Equitable Tobacco Reform Act as a contribution toward the funding of the buyout of tobacco growers and the transition to the free market system – again a mere obligation to pay money. As Justice Kennedy pointed out, such an obligation

> does not operate upon or alter an identified property interest, and it is not applicable to or measured by a property interest. The Coal Act does not appropriate, transfer, or encumber an estate in land (e.g., a lien on a particular piece of property), a valuable interest in an intangible (e.g., intellectual property), or even a bank account or accrued interest. The law simply imposes an obligation to perform an act, the payment of benefits.

<u>Eastern Enterprises</u>, 524 U.S. at 540, 118 S. Ct. at 2154 (Kennedy, J., concurring in the judgment and dissenting in part).[6]

Swisher's argument in this case challenges the very power of Congress to impose the obligation at issue upon Swisher. In other words, Swisher asserts "a substantive or absolute limit on the government's power to act." <u>Id.</u> at 545, 118 S. Ct. at 2157. As Justice Kennedy points out, the Takings Clause, by its plain

---

[6]     In support of its position that the takings analysis is appropriate, Swisher relies upon <u>Phillips v. Washington Legal Foundation</u>, 524 U.S. 156, 118 S. Ct. 1925 (1998), <u>Webb's Fabulous Pharmacies, Inc. v. Beckwith</u>, 449 U.S. 155, 101 S. Ct. 446 (1980), and <u>Connolly v. Pension Benefit Guaranty Corp.</u>, 475 U.S. 211, 106 S. Ct. 1018 (1986). <u>Phillips</u> and <u>Beckwith</u> are readily distinguishable. Both involve specific, identifiable, property interests which were invaded by the governmental action. <u>Phillips</u> involved the appropriation by the state of Texas of the interest earned on IOLTA accounts (Interest on Lawyers Trust Account). 524 U.S. at 159-60, 118 S. Ct. 1927-28. Under that program in Texas, and other states, certain client funds held by an attorney were deposited in bank accounts, and the statute provided that the interest generated by such funds was to be paid to a foundation to finance legal services for lower income individuals. <u>Id.</u> at 160, 118 S. Ct. at 1928. Similarly, in <u>Beckwith</u>, the state statute provided that the clerk of each county court should invest funds deposited in the registry of the court (e.g., in interpleader cases) in interest bearing bank accounts and that all interest accruing from such monies shall be deemed the income of the office of the clerk. 449 U.S. at 156 n.1, 101 S. Ct. at 448 n.1. Thus, both <u>Phillips</u> and <u>Beckwith</u> involved an invasion of specific identifiable property. In <u>Connolly</u>, appellants brought a Takings Clause challenge to a provision of the Multiemployer Pension Plan Amendments Act of 1980 which required an employer withdrawing from a multiemployer pension plan to pay a fixed and certain debt to the plan amounting to the employer's proportionate share of the plan's unfunded vested benefits. 475 U.S. at 221-23, 106 S. Ct. at 1024-25. Although appellants did not emphasize their property interest, the case did involve at least the semblance of a property interest. Prior to the enactment of the statute, an employer's sole obligation to the pension trust was to pay a fixed contribution required by the collective bargaining agreement. <u>Id.</u> at 218, 106 S. Ct. at 1022. The agreement clearly stated that the employer's obligation for pension benefits was ended when the employer paid the specified contribution. <u>Id.</u> Thus, <u>Connolly</u> is distinguished from the instant case in that there is no semblance of a property interest involved in this case. Moreover, the takings analysis conducted by the Supreme Court in <u>Connolly</u> merely reinforced the Court's belief "that the imposition of withdrawal liability does not constitute a compensable taking under the Fifth Amendment." <u>Id.</u> at 225, 106 S. Ct. at 1026.

language, does not operate as a substantive or absolute limit on the government's power; rather, it operates only as a conditional limitation, permitting the taking so long as the government pays just compensation. As the Supreme Court stated in 1987:

> As its language indicates, and as the Court has frequently noted, this provision [the Takings Clause] does not prohibit the taking of private property, but instead places a condition on the exercise of that power. This basic understanding of the amendment makes clear that it is designed not to limit the governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking.

First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304, 314-15, 107 S. Ct. 2378, 2385-86 (1987) (citations omitted).

In addition to the plain language of the Takings Clause, the case law following Eastern Enterprises supports the proposition that the takings analysis is not an appropriate vehicle to challenge the power of Congress to impose a mere monetary obligation without regard to an identifiable property interest. In Givens v. Alabama Department of Corrections, 381 F.3d 1064 (11th Cir. 2004), we held that an Alabama inmate had no private property interest in the interest earned on the monies deposited in a bank account in the inmate's name into which earnings of the inmate pursuant to the work-release program were deposited. Id. at 1070. Because "no recognized property interest is implicated here, . . . there is no

17

'taking.'" Id. Similarly, in the post-Eastern Enterprises cases construing the Coal

Act, and in analogous contexts, several circuit courts of appeals have applied a

substantive due process analysis, rather than a takings analysis.[7] Moreover, that the

---

        [7]        See Unity Real Estate Co. v. Hudson, 178 F.3d 649, 659 (3d Cir. 1999) ("[W]e believe that due process analysis encompasses the relevant concerns."); see also Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1339-40 (Fed. Cir. 2001) (en banc) (holding that a congressional imposition of an obligation to pay money does not constitute an unconstitutional taking of property, in a case challenging the special monetary assessments on domestic utilities for remediation of environmentally contaminated uranium processing facilities, the court rejected a Takings Clause challenge to the Energy Policy Act of 1992, citing Eastern Enterprises as well as previous Federal Circuit precedent); Parella v. Ret. Bd. of R.I. Employees' Ret. Sys., 173 F.3d 46, 58 (1st Cir. 1999) (holding, in the context of a Takings Clause challenge to a Rhode Island statute capping annual pension benefits of retired legislators, that plaintiffs must prove the deprivation of a property right to support a Takings Clause claim, relying upon Eastern Enterprises and previous First Circuit cases).

        However, other post-Eastern Enterprises cases construing the Coal Act have analyzed the claim employing both a Takings Clause analysis and a substantive due process analysis. Those cases have held that neither Justice O'Connor's opinion nor Justice Kennedy's constitutes binding precedent, and that the only binding aspect of the splintered decision is its specific result. See United States v. Alcan Aluminum Corp., 315 F.3d 179, 189 (2d Cir. 2003); see also Ass'n of Bituminous Contractors, Inc. v. Apfel, 156 F.3d 1246, 1254-55 (D.C. Cir. 1998). Incidentally, all of the post-Eastern Enterprises cases construing the Coal Act have upheld the statute as applied to the parties challenging same. See Bituminous Contractors, 156 F.3d at 1257 ("The clear implication of each opinion in Eastern Enterprises is that employer participation in the 1974 and 1978 agreements [which agreements first gave rise to the reasonable expectation of lifetime benefits] represents a sufficient amount of past conduct to justify the retroactive imposition of Coal Act liability . . . .").

        On the other hand, the Fifth Circuit in United States Fidelity & Guaranty Co. v. McKeithen, 226 F.3d 412 (5th Cir. 2000), did find a violation of the Takings Clause where a Louisiana statute imposed severe retroactive liability on a class of insurers who had withdrawn from (or substantially reduced their participation in) the Louisiana market prior to the passage of the statute. However, the Fifth Circuit decision is not inconsistent with our decision today. The Fifth Circuit noted that Justice Kennedy declined to apply a takings analysis because there was no identifiable property interest at issue in Eastern Enterprises. Id. at 420. Because McKeithen did involve an identifiable property interest, the Fifth Circuit concluded that Justice Kennedy's concern about the applicability of a takings analysis was moot in the Fifth Circuit case. Id. Moreover, the Fifth Circuit concluded that Justice Kennedy's reasoning was otherwise in

18

takings analysis is not appropriate in this case is supported by persuasive authority. Five Supreme Court Justices have expressed the view that the Takings Clause does not apply where there is a mere general liability (i.e., no separately identifiable fund of money) and where the challenge seeks to invalidate the statute rather than merely seeking compensation for an otherwise proper taking. Eastern Enterprises, 524 U.S. at 539-47, 118 S. Ct. at 2154-58 (Kennedy, J., concurring in the judgment and dissenting in part); id. at 554-56, 118 S. Ct. at 2161-63 (Breyer, J., joined by Stevens, J., Souter, J., and Ginsburg, J., dissenting).[8]

Accordingly, we conclude that it would be inappropriate in this case to apply a takings analysis.[9] This leaves only Swisher's substantive due process challenge.

---

harmony with that of Justice O'Connor's plurality opinion in Eastern Enterprises. Id.

[8] We have held that there is no binding precedent when five Justices have expressed a common view, when some are in the majority and some are in the dissent. Robison, 505 F.3d at 1221. Although not binding precedent, the common view of five Justices obviously carries persuasive authorities.

[9] Indeed, to apply a Takings Clause analysis in the instant case would constitute an even greater expansion of takings jurisprudence than Justice O'Connor's plurality opinion in Eastern Enterprises. There, at least there was some semblance of a property interest involved. The collective bargaining agreement which Eastern did sign in 1950 provided for a fixed 30-cents-per-ton royalty on coal produced as the contribution to be made by signatory operators. Eastern Enterprises, 524 U.S. at 506, 118 S. Ct. at 2138 (plurality opinion). Moreover, the contractual obligation to contribute expired with the expiration of the particular collective bargaining agreement. Thus, in Eastern Enterprises, the statutory assessment might well have been deemed to have been inconsistent with Eastern's contractual obligation, and an impairment of its property interest in that contract. By contrast, in the instant case, there is no semblance of a property interest; there is no contract limiting Swisher's obligations.

B.  Whether the Obligation to Pay Assessments under the Act Violates Swisher's Due Process Rights

Having determined that a takings analysis is not appropriate in this case, we turn to Swisher's argument that the Act violates its right to due process because it imposes retroactive liability that is disproportionate to Swisher's participation in the price support program. Economic legislation "come[s] to the Court with a presumption of constitutionality." Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15, 96 S. Ct. 2882, 2892 (1976). To prove that a statute violates its due process rights, the aggrieved party must demonstrate that the legislature has acted arbitrarily and irrationally. Id. at 15, 96 S. Ct. at 2892. However, if the government can show that the statute has a "legitimate legislative purpose furthered by rational means," due process is satisfied. Gen. Motors Corp. v. Romein, 503 U.S. 181, 191, 112 S. Ct. 1105, 1112 (1992). When a statute has a retroactive effect, the government must also prove that the statute's retroactive application furthers a legitimate legislative purpose. Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 730, 104 S. Ct. 2709, 2718 (1984).

As is apparent from our discussion above summarizing Justice Kennedy's substantive due process analysis in Eastern Enterprises, the primary factor which led to the holding that the Coal Act was unconstitutional was the fact that the Coal

20

Act imposed upon Eastern Enterprises a retroactive obligation "of unprecedented scope."   524 U.S. at 549, 118 S. Ct. at 2159.   The crucial difference between the instant case and Eastern Enterprises is that the obligation imposed upon Swisher in the instant case is not retroactive.   The Act provides:

> The Secretary, acting through the Commodity Credit Corporation, shall impose quarterly assessments during each of fiscal years 2005 through 2014, calculated in accordance with this section, on each tobacco product manufacturer and tobacco product importer that sells tobacco products in domestic commerce in the United States during that fiscal year.

7 U.S.C. § 518d(b)(1).  Under the plain meaning of the language of the statute, every tobacco manufacturer and importer currently participating in the domestic tobacco market is subject to the assessments.  Accordingly, a new manufacturer or importer would be subject to an assessment under the statute as a cost of doing business in the industry.   Contrary to Swisher's argument, the plain language of the statute clearly indicates that the assessments are not based upon the past conduct of tobacco manufacturers or importers.[10]  Quite the contrary, the assessment is based upon current participation in the market, such that new entrants are assessed, as well as those who participated in the past.

_____

[10]   It is true that a person must "demonstrate to the satisfaction of the Secretary that the person is a tobacco quota holder" in order to be eligible to receive a contract payment under the statute.  7 U.S.C. § 518a(b).  However, the fact that recipients of the payments must show they were quota holders does not imply that the obligation to pay assessments is based on past participation in the quota system.

21

Stripped of its argument that the Act is retroactive, Swisher's due process challenge is readily disposed of as being wholly without merit. We note again that congressional legislation "adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and . . . the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." Turner Elkhorn, 428 U.S. at 15, 96 S. Ct. at 2892. "Statutes may be invalidated on due process grounds only under the most egregious of circumstances." Eastern Enterprises, 524 U.S. at 550, 118 S. Ct. at 2159 (Kennedy, J., concurring in the judgment and dissenting in part). So long as congressional legislation "is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches." R.A. Gray, 467 U.S. at 729, 104 S. Ct. at 2717-18.

Applying that deferential standard, we readily conclude that the Act easily passes constitutional muster. The legitimate legislative purpose is apparent. Congress obviously perceived problems in the industry, perceived a need to eliminate the old subsidy system, and decided to move to a free market system. However, Congress recognized that tobacco farmers and quota holders should be provided some cushion for the transition. Seeing these economic problems in the

22

industry, Congress exercised its legitimate legislative powers to address same.  We also readily conclude that the means Congress chose to address these industry problems were rational.  Congress recognized that such a transition to a free market system would benefit all current and future tobacco manufacturers and importers, and thus devised a system of assessments to fund the transition to the free market system – i.e., assessing all current tobacco manufacturers and importers, all of whom would benefit from the transition to the free market system.  Moreover, tobacco manufacturers and importers currently engaged in the domestic market are entities that are not only likely to benefit from the deregulation, but also are entities best suited to pass such increased costs along to the ultimate consumers.[11]

We conclude that Congress exercised its powers to serve legitimate legislative purposes.  We also conclude that Congress chose rational means.  Thus, we conclude that Swisher has failed to show that the Act is arbitrary and irrational, and has failed to demonstrate that the Act is unconstitutional as applied to

---

[11]     Incidentally, the system advocated by Swisher might have placed a competitive burden upon the kind of tobacco that was previously subsidized by confining the assessments only to those sellers of tobacco products who previously purchased subsidized tobacco.  By contrast, the system adopted by Congress places upon domestic tobacco producers no such adverse competitive burden.   Rather, the statute spreads the burden of the assessments amongst all sellers of tobacco products in the domestic market (or more probably spreads such burden amongst all consumers of such tobacco products because the sellers will probably pass the burden through to the ultimate consumers).

Swisher.[12]

C.    Whether the Act Violates Swisher's Equal Protection Rights

Swisher also argues that the Act's methodology for allocating the

assessments violates Swisher's equal protection rights.[13]  This argument is without

[12]    Although we decided above that a takings analysis would not be appropriate in this case, a close analysis of the rationale of Justice O'Connor's plurality opinion in Eastern Enterprises and Justice Kennedy's concurrence reveals that the rationale employed in the two opinions is strikingly similar.  It is true that Justice O'Connor's rationale proceeded under the framework of the three factors of particular significance in regulatory takings:  economic impact; interference with reasonable investment backed expectations; and the character of the governmental action.  However, the factors she considered under that framework were virtually identical to the factors considered by Justice Kennedy under the due process framework.  In both opinions, the crucial factor was the retroactivity of unprecedented scope.  Both opinions focused on the fact that the new statutory obligations bore no relationship to Eastern's participation in the 1947 and 1950 agreements which predated the creation of any reasonable expectation on the part of employees of lifetime benefits.  Indeed, Justice O'Connor acknowledges that the "analysis of legislation under the Takings and Due Process Clauses is correlated to some extent." Eastern Enterprises, 524 U.S. at 537, 118 S. Ct. at 2153 (plurality opinion).  Similarly, Justice Kennedy notes: "[I]t is no accident that the primary retroactivity precedents upon which today's plurality opinion relies in its takings analysis were grounded in due process." Id. at 548, 118 S. Ct. at 2158 (Kennedy, J., concurring in the judgment and dissenting in part).  Because the rationale underpinning the two analyses is so similar, we strongly suspect that we would reach the same result should we undertake the takings analysis described in Justice O'Connor's opinion for the plurality in Eastern Enterprises.

For example, Swisher complains vigorously that the imposition of the instant assessment on it is out of proportion to its experience with the prior subsidy programs.  The flaw in Swisher's argument is that, unlike the situation in Eastern Enterprises, the assessments in the instant case are not based upon prior participation in the former subsidy programs. Quite the contrary, the assessments imposed by this Act are expressly based upon an entity's participation in the current domestic market for tobacco products.  In other words, the assessments in the instant case are not retroactive at all.

[13]    The Equal Protection Clause of the Fourteenth Amendment does not apply directly to the federal government; however, the principles of equal protection are applied to the federal government through the Due Process Clause of the Fifth Amendment. Bolling v. Sharpe, 347 U.S. 497, 498-500, 74 S. Ct. 693, 694-95 (1954).

24

merit because the Act is economic legislation and Swisher is not a member of a suspect class. "[E]qual protection is not a license for the courts to judge the wisdom, fairness, or logic of legislative choices." FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313, 113 S. Ct. 2096, 2101 (1993). "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Id. (emphasis added). The rational basis test demonstrates "the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one," and perfection is not required in making the necessary classifications. Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 314, 96 S. Ct. 2562, 2567 (1976).

Swisher contends that its equal protection rights are violated under Step A of the assessment determination because the maximum excise tax rate on cigars is used in determining the market share for the cigar industry, whereas the actual excise rate is used to determine the market share for cigarettes and other tobacco products. There is certainly a rational basis for choosing a unitary rate rather than the actual excise rate because "large cigars" are the only class of tobacco products that have a variable excise tax rate based on the price of the cigar. See 26 U.S.C. §

25

5701(a)(2). We readily conclude that it was not irrational for the Secretary to determine that it would be administratively convenient to choose one tax rate for calculating the market share for cigar manufacturers. Although the total share may not be perfectly equal, the methodology the Secretary uses meets the rational basis test.

Swisher also contends that its equal protection rights are violated under Step B because Swisher's intra-class share is determined by the number of cigars sold without any difference based on the cost or size of the cigar, and Swisher primarily produces less expensive, small cigars. Although the distribution of the intra-class share may not be perfect, choosing to allocate the assessment owed by each cigar manufacturer based on the number of cigars sold easily satisfies the highly deferential rational basis test. We readily conclude that it was not irrational for the Secretary to determine that basing this calculation on the volume of cigars sold would be administratively convenient.

Because there was a rational basis for the Act's methodology, we reject Swisher's equal protection challenge.

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of the Secretary.

AFFIRMED.

COX, Circuit judge, specially concurring:

I concur in the judgment. I agree that the Act does not violate the Takings Clause. I also concur in sections III.B. and III.C. of the opinion, holding that Swisher's due process and equal protection rights are not violated by the obligations the Act imposes on Swisher.