OPINION OF THE COURT
 

 Ciparick, J.
 

 The question presented by this appeal is whether the joint ballot provisions of Education Law § 202, providing for an alternative means of electing members of the State Board of Regents, where the Senate and Assembly fail to elect by concurrent resolution, violate article XI, §§ 1 and 2 — the Education Article — of the New York State Constitution. We say that they do not.
 

 Plaintiffs Kenneth P. LaValle, a State Senator, and David H. Pearl, a retired teacher, commenced this action in Supreme Court seeking declaratory and injunctive relief against defendants, 14 individually named regents, the Board of Regents of the State of New York, Alexander F. Treadwell, the Secretary of State, and the State of. New York. The underlying facts are undisputed. The Education Law provides guidelines
 
 *158
 
 for the election of state regents.
 
 *
 
 The Legislature must first attempt to elect regents by concurrent resolution. When the Senate and Assembly are deadlocked, the Legislature may use a “joint ballot” to elect regents. The individually named regent defendants were elected, on various dates, pursuant to the contested joint ballot method. Plaintiffs sought to enjoin defendant regents from assuming office, and additionally sought a declaration that the joint ballot provisions of Education Law § 202 (1) and (2) are unconstitutional. Following commencement of the action, defendants promptly moved to dismiss the action pursuant to CPLR 3211. Plaintiffs cross-moved for summary judgment. Supreme Court denied plaintiffs’ motion, and granted defendants’ motions dismissing the complaint. The Appellate Division affirmed. Plaintiffs now appeal as of right pursuant to CPLR 5601 (b) (1).
 

 Plaintiffs contend that joint ballot elections violate the constitutional delegation of legislative authority over regents expressly provided in article XI, §§ 1 and 2 of the State Constitution. Specifically, plaintiffs argue that the unicameral legislative body attendant to the joint ballot does not constitute the “legislature” as required in article XI, § 2 because only the Senate and Assembly acting bicamerally constitute the “legislature” within the meaning of the Constitution. In light of the validated and extensive historical use of the joint ballot, at both the federal and state levels, plaintiffs’ argument necessarily fails.
 

 I.
 

 The University of the State of New York is a corporate institution with roots that trace back to colonial America (NY
 
 *159
 
 Const, art XI, § 2; L 1784, ch 51). The University’s historical underpinnings provide useful insight into the resolution of this appeal.
 

 In the wake of the Revolutionary War, a newly minted State Legislature sought to provide for a pervasive state education system. In 1784, the Legislature established the University of the State of New York
 
 (see
 
 L 1784, ch 51). The University derives from a colonial remnant, the “Governors of the College of the Province of New York in the city of New York in America”
 
 (id.).
 
 The College was specifically structured as a corporate entity, charged with overseeing local education. Apparently satisfied with the colonial model, the Legislature transferred “all the rights priviledges and immunities” of the former institution to the University
 
 (id.).
 
 The 1784 statute expressly continued the “corporate” institution King George II initiated in colonial America, transforming the colonial “college” into a functioning “university”
 
 (see id.).
 

 Upon the creation of the University, the Legislature concomitantly created a governing body — the Board of Regents— empowered to maintain and secure the University’s advancement
 
 (id.; see also Shanker v Regents of Univ. of State of N.Y.,
 
 27 AD2d 84, 85 [3d Dept 1966],
 
 affd on op below
 
 19 NY2d 951 [1967]). The regents were statutorily endowed with the “full power and authority to ordain and make ordinances and bye laws for the government of the several colleges” and to, among other things, “found schools and colleges” (L 1784, ch 51). Essentially, the regents governed and directed all aspects of the University’s business.
 

 Originally, the individual members of the Board of Regents were themselves named in the text of the statute. In effect, the enactment itself represented a legislative election of individual regents. In total, the 1784 statute named 24 individual regents, as well as a number of ex officio members statutorily granted a position on the board. Additionally, this statute granted the Governor a limited power to fill board vacancies as they occurred. This gubernatorial appointment method was ultimately replaced by the “joint ballot” in 1787.
 

 Under the Articles of Confederation, each state was represented in Congress by “delegates” (Articles of Confederation art V). Article V expressly noted that delegates were to be appointed “in such manner as the legislatures of each state shall direct.” New York chose the joint ballot. Article XXX of the first Constitution of New York, 1777, governed the appoint
 
 *160
 
 ment of “Delegates to * * * Congress.” Article XXX provided that delegates were to “be chosen by the joint ballot of the [state] senators and members of assembly so met together.” The Legislature, in 1787, ultimately applied this same method to regents, abolishing the gubernatorial power to fill vacancies, and replacing it with the same process used to elect delegates— the joint ballot (L 1787, ch 82).
 

 The new act provided that regent vacancies were to be “supplied by the legislature in the manner in which delegates to Congress are appointed” (L 1787, ch 82). Delegates were still elected in accordance with the joint ballot provision articulated in article XXX of the Constitution of 1777. Interest in the perpetual statutory election system sanctioned by the Legislature during the initial years of the regents’ existence began to wane, and ultimately it was replaced when the Legislature enacted constitutional provisions concerning the University and the regents.
 

 Article IX of the Constitution of 1894 expressly endorsed the establishment of the University and the regents. Two years prior, the United States Supreme Court, in
 
 McPherson v Blacker
 
 (146 US 1 [1892]), indirectly approved the use of the joint ballot as a valid and constitutional means of electing state electors. When New York’s constitutional convention convened in 1894, the delegates were well aware of the use of the joint ballot on both the federal and state levels.
 

 Article IX of the Constitution of 1894 stated that “the Legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this State may be educated” (NY Const of 1894, art IX, § 1). It embodied most of the prior statutory ideals and framework governing election of the regents and maintenance of the University. Article IX, § 2 “continued” the University, granting sole control of the University and regents to the Legislature. Implied in this grant of authority was the power to elect regents. Article IX was subsequently renumbered and transposed, in its entirety, to what is currently article XI of the State Constitution. Thus, for more than two centuries the joint ballot has been an integral part of the procedure for selecting regents. The framers of the 1894 Constitution knew this when they adopted the predecessor to article XI, § 2, “crystaliz[ing] into a constitutional mandate the settled policy of the State” (1894 Report of Comm on Educ and Funds Pertaining Thereto, at 5, reprinted in 1894 Doc and Reports of NY Constitutional Convention, at 118). Plaintiffs’ argument that this “policy” was
 
 *161
 
 merely intended to maintain the Legislature’s authority over the regents, is too constricted. The better view is that the constitutional framers also intended to preserve the means to ensure continued effectiveness of the regents. This, in turn, would presuppose the continuation of a suitable means for electing regents in the event of legislative deadlock. Against this backdrop, we evaluate the constitutionality of the joint ballot.
 

 II.
 

 Legislative enactments enjoy a strong presumption of constitutionality
 
 (see Paterson v University of State of N.Y.,
 
 14 NY2d 432, 438 [1964]). While the presumption is not irrefutable, parties challenging a duly enacted statute face the initial burden of demonstrating the statute’s invalidity “beyond a reasonable doubt”
 
 (People v Tichenor,
 
 89 NY2d 769, 773 [1997];
 
 see also People v Pagnotta, 25
 
 NY2d 333, 337 [1969]). Moreover, courts must avoid, if possible, interpreting a presumptively valid statute in a way that will needlessly render it unconstitutional
 
 (see Alliance of Am. Insurers v Chu, 77
 
 NY2d 573, 585 [1991]). These well-established principles guide our analysis.
 

 Article XI, § 1 of the State Constitution expressly grants the “legislature” the power to promote and maintain the state educational system. Just as article EX of the 1894 Constitution did, article XI provides that the “legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated” (NY Const, art XI, § 1). Article XI, § 2 constitutionalizes the University of the State of New York, indicating that the
 

 “corporation created in the year one thousand seven hundred eighty-four, under the name of The Regents of the University of the State of New York, is hereby continued under the name of The University of the State of New York. It shall be governed and its corporate powers, which may be increased, modified or diminished by the legislature, shall be exercised by not less than nine regents.”
 

 The “legislature” is therefore constitutionally given authority and control over the University and the regents. The contemporary legislative exercise of this constitutionally conferred power is found in Education Law article 5.
 

 Education Law article 5 provides an extensive statutory framework for the structure and organization of the University
 
 *162
 
 of the State of New York. Section 202 focuses exclusively on the University’s governing body — the Board of Regents. It prescribes the proper structure and composition of the board (Education Law § 202 [1]). It provides that the “University of the State of New York shall be governed and all its corporate powers exercised by a board of regents the number of whose members shall at all times be four more than the number of the then existing judicial districts of the state and shall not be less than fifteen” (Education Law § 202 [1]). Relatedly, it also provides a mode of election for the regents. The Legislature must first attempt to elect regents by concurrent resolution
 
 0see
 
 Education Law § 202 [1]). Thereafter, if the Legislature cannot bicamerally agree on a candidate, a joint session must be convened using a “joint ballot” to elect the regent
 
 (see id.).
 
 Regent “vacancies” are filled in the same manner — primarily by concurrent resolution, or in the alternative, by joint ballot (Education Law § 202 [2]).
 

 The Legislature, although typically, and necessarily functioning in its lawmaking capacity in the form of a bicameral body, can also function unicamerally when performing duties other than lawmaking
 
 (see Matter of Anderson v Krupsak,
 
 40 NY2d 397 [1976]). The quintessential “legislative power,” its lawmaking power, unlike the power to elect regents at issue here, is directly conferred to and “vested in the senate and assembly” (NY Const, art III, § 1). The Constitution itself thus prohibits the enactment of laws “except by the assent of a majority of the members elected to each branch of the legislature” (NY Const, art III, § 14).
 

 The lawmaking prescription contained in article III does not, however, negate or undermine the Legislature’s ability to convene as a unicameral body, in a distinct, nonlawmaking capacity. The Legislature — whether functioning bicamerally, or sitting in joint session and acting unicamerally — is nevertheless the “legislature” as it is understood in article XI
 
 (Lanza v Wagner,
 
 11 NY2d 317, 333 [1962],
 
 cert denied
 
 371 US 901 [“(T)he exercise of the power of appointment to public office is not a function of * * * essentially legislative character * * *”]). Similarly, under the Federal Constitution, not all legislative actions are “subject to the bicameralism * * * requirement!]”
 
 (Immigration & Naturalization Serv. v Chadha,
 
 462 US 919, 952 [1983]). Instead, whether legislative actions are “an exercise of legislative power depends not on their form but upon ‘whether they contain matter which is properly to be regarded as legislative in its character and effect’ ”
 
 (id.
 
 [cita
 
 *163
 
 tion omitted]). There is no constitutional proscription against the Legislature acting unicamerally in a nonlawmaking capacity, and we are unwilling to impose one here.
 

 The Legislature has chosen to exercise its constitutionally conferred authority by enacting valid legislation — Education Law § 202 — to govern the election of regents. The alternative joint ballot method is neither constitutionally infirm nor statutorily defective. It is simply an alternative procedure, fashioned to avoid lengthy unproductive deadlocks in the appointment process. It provides the Legislature with an efficient means of filling empty seats promptly on the Board of Regents.
 

 Our decision in
 
 Matter of Anderson v Krupsak (supra)
 
 further supports the result we reach today. In
 
 Anderson,
 
 we reviewed the legislative quorum requirements as they pertained to the joint ballot method of election prescribed in Education Law § 202. We held that “a quorum was simply a majority of the total membership of the unicameral body, without regard to whether those members come from the Senate or the Assembly”
 
 (Anderson,
 
 40 NY2d at 405). In essence, “a quorum of the joint meeting was simply a majority of the single body”
 
 (id.).
 
 We did not require a Senate quorum. Moreover, in construing the unicameral quorum requirements, we implicitly acknowledged the validity of the Legislature acting as a unicameral body, sitting in joint session and functioning, constitutionally, in this nonlawmaking capacity. Indeed, we did so over a dissent urging the constitutional infirmity of the scheme
 
 (see id.
 
 at 406-408 [Gabrielli, J., dissenting]).
 

 Finally, it should be noted that our approval of the joint ballot as a means of electing state officials is not without precedent. While historically used in the election of regents, the joint ballot is also used in other contexts
 
 (see
 
 Public Officers Law § 41;
 
 see also Marino v Weprin,
 
 192 AD2d 174 [1993]). Public Officers Law § 41 affirmatively sanctions and adopts the joint ballot as the preferred means of filling vacancies in the elected offices of State Comptroller and Attorney General. It provides that
 

 “[w]hen a vacancy occurs or exists, other than by removal, in the office of comptroller or attorney-general, or a resignation of either such officer to take effect at any future day shall have been made while the legislature is in session, the two houses thereof,
 
 by joint ballot,
 
 shall appoint a person to fill such actual or prospective vacancy” (Public Officers Law § 41 [emphasis added]).
 

 
 *164
 
 We conclude that the New York State Senate and Assembly, meeting in a joint session as a unicameral body, constitute the Legislature as contemplated by article XI, §§ 1 and 2 of the New York State Constitution. Plaintiffs have thus failed to rebut, beyond a reasonable doubt, the presumption of constitutionality that favors the joint ballot provisions of Education Law § 202 (1) and (2).
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Smith, Levine, Wesley, Rosenblatt and Graffeo concur.
 

 Order affirmed, with costs.
 

 *
 

 Education Law § 202 provides, in pertinent part, that
 

 “1. * * * Each regent shall be elected by the legislature by concurrent resolution in the preceding March, on or before the first Tuesday of such month. If, however, the legislature fails to agree on such concurrent resolution by the first Tuesday of such month, then the two houses shall meet in joint session at noon on the second Tuesday of such month and proceed to elect such regent by joint ballot.
 

 “2. * * * [If a] vacancy [in such office] occurs after the second Tuesday in March and before a resolution to adjourn sine die has been adopted by either house, then the vacancy shall be filled by concurrent resolution, unless the legislature fails to agree on such concurrent resolution within three legislative days after its passage by one house, in which case the two houses shall meet in joint session at noon on the next legislative day and proceed to elect such regent by joint ballots.”