This opinion is uncorrected and subject to revision before publication in the New York Reports.
--------------------------------------------------------------------

No. 96
American Economy Insurance
Company, et al.,
            Respondents,
        v.
State of New York, et al.,
            Appellants.


            Steven C. Wu, for appellants.
            Seth P. Waxman, for respondents.
            American Insurance Association et al.; Electrical
Employers Self Insurance Safety Plan, amici curiae.


FAHEY, J.:

        Workers' compensation insurance is a heavily regulated

area of the law.  Any modification almost always has a

prospective impact and can sometimes have a retroactive impact on

the parties to the insurance coverage contract.  At issue here is

the New York State Legislature's 2013 amendment to Workers'

- 1 -

Compensation Law § 25-a.

We conclude that, assuming the amendment has a retroactive impact by imposing unfunded costs upon plaintiffs for policies finalized before the amendment's effective date, that retroactive impact is constitutionally permissible.

I.

Plaintiffs are approximately 20 insurance companies that write workers' compensation insurance policies in New York. They challenge the legislature's 2013 amendment to Workers' Compensation Law § 25-a, which closed the Special Fund for Reopened Cases (the Fund) to new applications after January 1, 2014.

A. The Fund's Background

The Fund was established in 1933.  Its original purpose was to ensure that injured workers with "closed" cases that unexpectedly "reopened" after many years due to, for example, "a recurrence of malady, a progress in disease not anticipated, or a pathological development not previously prognosticated" (Matter of Ryan v American Bridge Co., 243 App Div 496, 498 [3d Dept 1935], affd 268 NY 502 [1935]), would continue to receive necessary benefits, even if the insurance carrier had become insolvent.  The Fund was also created to protect insurance carriers and employers from uncertain future liability costs they might incur in these "stale" cases (see id. at 498-499).

The Fund was initially financed with a one-time

assessment on insurance carriers, but that funding eventually
became inadequate, and in 1948 the legislature authorized the
Workers' Compensation Board (the Board) to impose annual
assessments on carriers to maintain the Fund.  The carriers were
permitted to pass those assessments on to their insureds through
policyholder surcharges.  The cost of the Fund was therefore
ultimately borne by New York employers, not insurance carriers.

Before the Fund's closure in 2014, benefits on a
reopened case would be paid by the Fund under the following
conditions.  First, the case must have been previously "closed"
either formally or informally, i.e., "no further proceedings were
foreseen" (Matter of Casey v Hinkle Iron Works, 299 NY 382, 385
[1949]; see Matter of Riley v Aircraft Prods. Mfg. Corp., 40 NY2d
366, 370 [1976]).  Second, the case must have reopened, which
often occurred due to an unanticipated change in the claimant's
medical condition.  Third, a minimum of seven years must have
elapsed from the date of injury.  Finally, three years must have
elapsed from the date of the last payment of compensation
(see former Workers' Compensation Law § 25-a [1]).[1]  Neither the
Fund nor any carrier or self-insured employer was required to pay
benefits on a claim if both 18 years had elapsed from the date of

------

[1]    Different provisions applied where death resulted from
the injury, where the initial claim for compensation had been
disallowed, or where the claim had "been otherwise disposed of
without an award of compensation" (see former Workers'
Compensation Law § 25-a [1]).

injury or death and 8 years had elapsed from the last payment of compensation (see Workers' Compensation Law §§ 25-a [6]; 123).

Whether those requirements were met in any particular case was often the subject of litigation. For example, the Appellate Division, Third Department decided cases regarding when the "last payment of compensation" was made (see e.g. Matter of Nicpon v Zelasko Constr., Inc., 120 AD3d 66, 67-68 [3d Dept 2014]), and whether additional payment to the claimant constituted "deficiency compensation" that rendered a case ineligible for assignment to the Fund (see e.g. Matter of Marshall v Roth Bros. Smelting Corp., 55 AD3d 1189, 1190-1191 [3d Dept 2008], lv denied 12 NY3d 702 [2009]). In that regard, one of the most litigated issues was whether a case had previously been "truly closed," or whether further proceedings were contemplated (see e.g. Matter of Palazzolo v Dutchess County, 132 AD3d 1053, 1054-1055 [3d Dept 2015]; Matter of Bates v Finger Lakes Truck Rental, 41 AD3d 957, 959-960 [3d Dept 2007]; Matter of Washburn v Bob Hooey Constr. Co., 39 AD3d 956, 957-958 [3d Dept 2007]). Whether the case was truly closed was a factual determination for the Board to make under the circumstances of each particular case (see Matter of Reddien v Joseph Davis Inc., 136 AD3d 1144, 1145 [3d Dept 2016]). Any party aggrieved by the decision of the workers' compensation law judge had avenues for administrative review and appeal (see generally Workers' Compensation Law § 23).

Transfer of any particular case to the Fund was therefore often a speculative matter based on uncertain future events, and subject to litigation. Once it had been determined that all requirements for transfer to the Fund were met, however, transfer was mandatory, not discretionary (see former Workers' Compensation Law § 25-a [1]; Matter of De Mayo v Rensselaer Polytech Inst., 74 NY2d 459, 462-463 [1989]).

### B. Closure of the Fund

The parties dispute the circumstances precipitating the legislature's decision to close the Fund. Defendants point to the Fund's drastically increased costs after 2006. They attribute these rising costs to the carriers' practice of increasingly pushing claims to the Fund, including by engaging in "indemnity-only" settlements that allowed carriers to apply for transfer of anticipated future medical costs to the Fund. Defendants also note that the closure of the Special Disability Fund[2] in 2007 may have inadvertently provided carriers with an increased incentive to transfer claims to the Fund. Plaintiffs dispute this. They assert that medical costs in general rose significantly over the same time period, and that they had no incentive to engage in indemnity-only settlements in order to

---

[2]     The Special Disability Fund had reimbursed carriers and self-insured employers, under certain specified conditions, for benefits paid to a claimant with a preexisting impairment due to an injury suffered during previous employment (see generally Martin Minkowitz, New York Workers' Compensation §§ 9:1-9:5 at 424-430 [2d ed 27 West's NY Prac Series 2011]).

transfer medical costs to the Fund.

Whatever the reason, it is undisputed that the Fund's costs had increased dramatically before 2013. Plaintiffs noted in their complaint that there had been "a surge in reopened cases in recent years." Defendants assert that the annual assessment required to maintain the Fund was approximately $95 million in 2006, but that number had increased to over $300 million by the end of 2012.

Against this backdrop, in 2013, the legislature decided to close the Fund to new applications. The amendment was included in the Budget Reconciliation Act of 2013, as part of several reforms to the Workers' Compensation Law included in the "Business Relief Bill" (L 2013, ch 57, part GG, § 13 [effective March 29, 2013]). The bill amended Workers' Compensation Law § 25-a to add subdivision 1-a, which provided that "[n]o application by a self-insured employer or an insurance carrier for transfer of liability of a claim to the fund for reopened cases shall be accepted by the board on or after the first day of January, two thousand fourteen" (L 2013, ch 57, part GG, § 13). Essentially, the legislature closed the Fund to new applications after January 1, 2014, providing an approximately nine-month grace period during which the Board would consider new applications (see id.). The Fund remains open to administer reopened cases previously assigned to the Fund.

The memorandum in support of that portion of the bill

concerning the Fund's closure stated:

> "Closing the Fund would save New York
> businesses hundreds of millions of dollars in
> assessments per year.  The Fund provides
> payments directly to claimants and health
> providers when the claimant's case is
> reopened under certain circumstances.  The
> original intent of the Fund was to provide
> carriers relief in a small number of cases
> where liability unexpectedly arises after a
> case has been closed for many years.
> However, carriers do not need this relief
> because the premiums they have charged
> already cover this liability.  This reform
> prevents a windfall for such carriers"
> (Memorandum in Support, 2013-2014 New York
> State Executive Budget, Public Protection and
> General Government Article VII Legislation,
> at 29, available at
> https://www.budget.ny.gov/pubs/archive/fy1314
> archive/eBudget1314/fy1314artVIIbills/PPGG_Ar
> ticleVII_MS.pdf [last accessed October 5,
> 2017]).

Workers' compensation insurance policies are occurrence-based, meaning that each policy provides coverage for any claims arising from an accident occurring during that policy year, regardless of when the claim is made.  As such, the premium charged in each policy year is calculated to be sufficient to cover all of the carrier's liability arising from any accidents occurring during that policy year, including liability that might arise years after an injury occurred (see generally Minkowitz, New York Workers' Compensation § 18:11, at 776).

Premiums charged by carriers to their insureds are generally a function of two factors: "loss costs," representing losses carriers are likely to incur under their policies, and "loss-cost multipliers," representing each individual carrier's

profit and expense structure.  In New York, the New York

Compensation Insurance Rating Board (NYCIRB) -- a nonprofit

association of insurance carriers -- is responsible for

calculating loss costs used by carriers in setting premiums.

NYCIRB makes an annual recommendation to the Department of

Financial Services (DFS) regarding whether loss cost levels

should be adjusted for the upcoming policy year.  Carriers may

deviate from the DFS-approved rates only with DFS's permission.

Before the closure of the Fund, NYCIRB did not include

in its loss cost calculations any costs carriers would incur on

claims that would qualify for assignment to the Fund.  Plaintiffs

therefore allege that the premiums they charged for policies

written before October 2013[3] did not include such costs.

Plaintiffs further allege that, before 2013, their loss reserves

did not account for any liability they might incur on reopened

cases that would qualify for administration by the Fund.

NYCIRB acknowledged in 2013 that the closure of the

Fund would result in "unfunded liability" for workers'

compensation carriers.  NYCIRB explained:

> "The unfunded liability results from claims
> on current and past policies which were
> closed, may be reopened in the future, and
> would have been subject to the provisions of

_____

[3]      Plaintiffs assert that although the amendment was
effective in March 2013, its alleged retroactive impact
encompasses all policies issued before October 2013, when a DFS-
approved rate increase took effect (see American Economy Ins. Co.
v State of New York, 139 AD3d 138, 141-142 [1st Dept 2016]).

Section 25-A.  For example, a policy from 2007 could have had a claim that is now closed, and the last payment on which was in 2012. If this claim reopens in, for example, 2016, it could have been deferred to the Reopened Case Fund, but since the bill provides for the Fund's closure, this claim would remain the responsibility of the carrier.  However, the premium charged for this policy did not incorporate that possibility, and assumed such costs would be borne by the Fund.  Therefore, there is an unfunded liability which will have to be paid by the carriers (i.e. a retrospective cost impact)" (NYCIRB, Analysis of Proposed Bills to Reform the Workers Compensation System, March 14, 2013, at 2, available at http://nycirb.net/2007/depts/actuary/S2605c.pdf [last accessed October 5, 2017]).

NYCIRB estimated that carriers would incur collective unfunded liability of between $1.1 and $1.6 billion (id. at 3). Plaintiffs allege that their own share of this unfunded liability is approximately $62 million.  Both parties assert that the carriers technically cannot recoup these costs by charging higher premiums in future policy years because, as an actuarial matter, the ratemaking process is entirely prospective.  Plaintiffs further note that in July 2013, DFS approved NYCIRB's recommended 4.5% increase in loss costs on future policies to account for the Fund's closure.  Plaintiffs assert that this increase constitutes an acknowledgment that premiums charged before 2013 did not account for the costs of reopened cases that would have been assigned to the Fund.

## C. The Present Litigation

Plaintiffs commenced the present declaratory judgment

action in Supreme Court in July 2013.  They alleged that the legislature's amendment to section 25-a operated retroactively to the extent that it imposed unfunded liability upon plaintiffs in connection with future reopened claims made on policies finalized before the amendment's effective date.  Plaintiffs contended that this retroactive impact violated the Contract Clause of the Federal Constitution and the Takings and Due Process Clauses of the Federal and State Constitutions.  Defendants thereafter moved to dismiss the complaint, and plaintiffs cross-moved for summary judgment.

Supreme Court granted defendants' motion to dismiss the complaint.  The court concluded that the legislative amendment to section 25-a operated prospectively, inasmuch as it closed the Fund only to new applications, and only after a nine-month grace period.  The court further rejected plaintiffs' constitutional challenges to the amendment.

The Appellate Division reversed and entered a judgment declaring Workers' Compensation Law § 25-a (1-a) unconstitutional "as retroactively applied to policies issued before October 1, 2013" (American Economy Ins. Co. v State of New York, 139 AD3d 138, 147 [1st Dept 2016]).  The court concluded that the statutory amendment operated retroactively to the extent that it imposed unfunded liability on plaintiffs "for reopened cases arising from accidents occurring before October 1, 2013 that would have otherwise qualified for transfer under Workers'

Compensation Law § 25-a" (id. at 143). The Appellate Division reasoned that "the closure of the Fund here, by ending plaintiffs' right to transfer eligible cases to the Fund, retroactively deprived them of the entirety of the benefit of this right and created a new class of unfunded liability" (id. at 145). The court further concluded that "the record fails to reflect that the legislature amended the statute with an understanding of the impact it would have on policies issued before October 1, 2013" (id.).

With respect to plaintiffs' constitutional claims, the Appellate Division concluded that the amendment, "as applied retroactively, violates the Contract Clause of the US Constitution because it retroactively impairs an existing contractual obligation to provide insurance coverage '[w]here . . . the insurer does not have the right to terminate the policy or change the premium rate'" (id. at 145-146, quoting Health Ins. Assn. of Am. v Harnett, 44 NY2d 302, 313 [1978]). The court rejected defendants' arguments that the legislation was reasonable and necessary to serve a legitimate public purpose, concluding that the "the legislation's stated purpose of preventing a windfall to insurance carriers was based upon the erroneous premise that premiums already cover this new liability" (id. at 146). Finally, the Appellate Division concluded that "[r]etroactive application would also constitute a regulatory taking in violation of the Takings Clause" (id.). The court did

not address plaintiffs' due process arguments.

Defendants appealed to this Court as of right pursuant to CPLR 5601 (b) (1).  We now reverse.

II.

Defendants first contend that the Fund's closure had only prospective effect, inasmuch as the Fund was closed only to new applications after a nine-month grace period.  Defendants therefore argue that the closure altered only plaintiffs' future costs with respect to cases that might reopen at some uncertain future date.  Plaintiffs respond that the Appellate Division correctly held that the amendment operated retroactively by imposing "'new legal consequences to [a relationship] completed before its enactment'" (American Economy, 139 AD3d at 143, quoting Eastern Enterprises v Apfel, 524 US 498, 532 [1998]).

Both parties rely on the definition of retroactivity contained in Landgraf v USI Film Products (511 US 244 [1994]).  In that case, the Supreme Court observed that "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment, . . . or upsets expectations based in prior law.  Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment" (id. at 269-270).  The Court explained that "[e]ven uncontroversially prospective statutes may unsettle expectations and impose burdens on past conduct," and that "a statute is not made retroactive

merely because it draws upon antecedent facts for its operation" (id. at 269 n 24 [internal quotation marks omitted]). A statute has "retroactive effect," however, if "it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed" (id. at 280).

We have previously confronted the issue of alleged retroactive impact of amendments to the Workers' Compensation Law. Recently, in Matter of Raynor v Landmark Chrysler (18 NY3d 48 [2011]), we noted that "[t]he fact that [an] award may relate to an injury that occurred prior to the enactment of the statute does not render it retroactive" (id. at 57). As the Appellate Division observed, however (see American Economy, 139 AD3d at 143-144), Raynor concerned a legislative amendment that altered only the time and manner of workers' compensation insurance carriers' payments for specified awards, including awards pertaining to injuries that occurred before the law's effective date, and not the amount of those payments (see Raynor, 18 NY3d at 57).

In Becker v Huss Co. (43 NY2d 527 [1978]), we concluded that an amendment to the Workers' Compensation Law requiring carriers to contribute to a claimant's litigation costs in a third-party action, even with respect to litigation regarding an injury occurring before the law's effective date, might have some retroactive impact on carriers. We recognized that the law

"saddl[ed carriers] with financial obligations not contemplated when prior insurance premiums had been computed" (id. at 540). We acknowledged the difficulty, however, of defining that retroactive impact, stating that "the amendment neither created a new right nor impaired an existing one, although the reallocation might be characterized verbally either way," and we characterized any "right" the carriers possessed as "inchoate" (id. at 542). We noted that, viewing the workers' compensation system broadly, "[t]he allocation of economic benefits and burdens has always been subject to adjustment" (id. at 541). That system "designedly, has flexibility, much greater than that found in the more traditional forms of law. Thus, it is not unusual that carriers or employers have had their burdens shifted or increased with relation to past industrial accidents" (id.). We concluded that the legislative amendment should apply to any judgment or settlement entered after the effective date of the legislation, "even if the injury occurred or the third-party action was brought before that date" (id. at 542).

Similar to the claim of the carriers in Becker that they had been "saddl[ed] . . . with financial obligations not contemplated when prior insurance premiums had been computed" (id. at 540), plaintiffs contend that the 2013 amendment to section 25-a operates retroactively by imposing upon them additional, unfunded costs that were not contemplated by premiums they charged in past policy years, which premiums were approved

by the state.  Whether this alleged retroactive application of the amendment "attaches new *legal* consequences to events completed before its enactment" (Landgraf, 511 US at 270 [emphasis added]) is debatable.  Nevertheless, even assuming arguendo that the amendment has retroactive impact to the extent it imposes unfunded liability costs upon plaintiffs under policies finalized before the amendment's effective date, we conclude that this retroactive impact is constitutionally permissible.

### III.

As the Supreme Court has stated, "the constitutional impediments to retroactive civil legislation are now modest" (Landgraf, 511 US at 272 [emphasis omitted]).  "Absent a violation" of a specific constitutional provision, "the potential unfairness of retroactive civil legislation is not a sufficient reason for a court to fail to give a statute its intended scope" (id. at 267).

Moreover, "'[i]t is well settled that acts of the Legislature are entitled to a strong presumption of constitutionality'" (Matter of County of Chemung v Shah, 28 NY3d 244, 262 [2016], quoting Cohen v Cuomo, 19 NY3d 196, 201 [2012]; see Farrington v Pinckney, 1 NY2d 74, 78 [1956]).  Plaintiffs bear the ultimate burden of overcoming that presumption by demonstrating the amendment's constitutional invalidity beyond a reasonable doubt (see County of Chemung, 28 NY3d at 262;

Overstock.com, Inc. v New York State Dept. of Taxation & Fin., 20 NY3d 586, 593 [2013], cert denied -- US --, 134 S Ct 682 [2013]; LaValle v Hayden, 98 NY2d 155, 161 [2002]; Cook v City of Binghamton, 48 NY2d 323, 330 [1979]).  Even treating all allegations in the complaint as true and affording plaintiffs every possible favorable inference, as we must on defendants' motion to dismiss (see Leon v Martinez, 84 NY2d 83, 87-88 [1994]), we conclude that the amendment is constitutional.

### A. Contract Clause

The Contract Clause of the US Constitution "prohibits states from enacting '[l]aw[s] impairing the Obligation of Contracts'" (Raynor, 18 NY3d at 58, quoting US Const, art I, § 10 [1]).  "The Supreme Court has repeatedly held that this language should not be read literally and that the States retain the power 'to safeguard the vital interests of [their] people'" (19th St. Assoc. v State of New York, 79 NY2d 434, 442 [1992], quoting Home Bldg. & Loan Assn. v Blaisdell, 290 US 398, 434 [1934]).  "'The threshold inquiry is whether the state law has, in fact, operated as a substantial impairment of a contractual relationship'" (id., quoting Energy Reserves Group v Kansas Power & Light, 459 US 400, 411 [1983]).  "In determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past" (Energy Reserves Group, 459 US at 411).  As the Supreme Court "long ago observed: 'One whose rights, such as they are, are subject to state restriction,

cannot remove them from the power of the State by making a contract about them'" (id., quoting Hudson Water Co. v McCarter, 209 US 349, 357 [1908]).

Before determining whether there has been a *substantial* impairment of a contractual relationship, however, we must determine whether there has been *any* impairment of a contractual relationship.  Stated another way, the initial inquiry contains "three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial" (General Motors Corp. v Romein, 503 US 181, 186 [1992]).

There is no dispute that plaintiffs have a contractual relationship with their insureds in the form of their insurance policies.  We conclude, however, that the legislative amendment at issue does not impair that contractual relationship.

We note that, unlike the obvious contractual relationship between plaintiffs and *their insureds*, there is no contract establishing a legal relationship between plaintiffs and the Fund in the record before us.  In fact, there is no contract in the record before us whatsoever.  Plaintiffs have provided us with a document they refer to as their New York form insurance policy, which they assert contains the relevant contractual terms for pre-2013 policy periods.[4]  This document does not mention the

---

[4]     The document in the record is entitled "Workers Compensation and Employers Liability Insurance Policy Quick Reference."  A disclaimer on that document prominently states:

Fund.  It does not guarantee plaintiffs the right to transfer reopened cases to the Fund, nor could it bind the Fund to continue to administer those claims.  It does not condition plaintiffs' obligation to pay benefits required by the workers' compensation law on the Fund's continuing existence or acceptance of applications to transfer liability costs on reopened cases to the Fund.  The closure of the Fund therefore does not impair any term of plaintiffs' contracts with their insureds.

Plaintiffs nevertheless assert that liability for section 25-a claims was excluded from the scope of the policies' coverage.  They point to language in the document stating that plaintiffs will pay "promptly when due the benefits required of [the employer-insured] by the workers compensation law," and defining the workers' compensation law to "include[] any amendments to that law which are in effect during the policy period."  According to plaintiffs, this language provides coverage only to the extent required by state law as that state

"This Quick Reference is not part of the Workers Compensation and Employers Liability Policy and does not provide coverage.  Refer to the Workers Compensation and Employers Liability Policy itself for actual contractual provisions."  Thus, the document plaintiffs have provided us is not their contract with their insureds and does not even purport to include that contract's provisions.  Nevertheless, plaintiffs ask us to declare that a statute unconstitutionally impairs a contract they have not put before us, and they assert that the Quick Reference contains the contractual provisions on which their demonstration of constitutional invalidity relies.  As defendants do not challenge this assertion, we therefore assume, for purposes of this appeal, that this document contains those relevant contractual provisions.

law existed during the policy period, and any later amendments to the state law that alter plaintiffs' obligations are not included in the scope of coverage.  At the time these policies were finalized, the Fund was accepting obligations on reopened cases that met the requirements for transfer, and therefore, plaintiffs argue, plaintiffs' contracts with their insureds exclude from the scope of coverage any benefits paid on a reopened case that would have qualified for assignment to the Fund before its closure. Accordingly, plaintiffs argue that the 2013 amendment to section 25-a alters the scope of their coverage under the policies.

To the extent plaintiffs' contention can be construed as an argument that their policies do not obligate them to cover liability on reopened cases that would have been assigned to the Fund before the amendment, plaintiffs' interpretation of this policy language is inconsistent with their assertion underpinning their first contention regarding retroactivity, i.e., that the amendment has retroactive effect by imposing unfunded liability upon plaintiffs under policies completed before the amendment's effective date.  Their interpretation is also inconsistent with their concession that their insurance policies, written and finalized before the 2013 amendment, obligate them to cover the costs of liability on any reopened case that otherwise would have qualified for transfer to the Fund before the amendment.

In any event, plaintiffs' Contract Clause claim confuses their legal *liability* for reopened cases with their

ability to transfer the *costs* of that liability.  Plaintiffs' contracts with their insureds obligated them to pay all benefits required of their insureds by the Workers' Compensation Law, including any amendments to that law which are in effect during the policy period, and thus require plaintiffs to pay all necessary benefits on reopened cases.

Pursuant to those contracts, which consistently assume the risk of legislative change, liability for any benefit required of employers by the Workers' Compensation Law ultimately rested with the carriers.  The amendment merely altered the allocation of costs of that liability by removing an avenue for carriers to transfer reopened cases to the Fund, and then to pass assessments for the costs of those cases onto their insureds. Inasmuch as plaintiffs did not contract with their insureds for the right to transfer reopened cases to the Fund, or condition their liability to pay benefits on reopened cases on the Fund's continuing acceptance of those cases, plaintiffs' contracts with their insureds have not been impaired by the amendment.  Put differently, there is no provision of plaintiffs' contracts with their insureds relieving them of the obligation to pay an injured worker's benefits in the event that the Fund did not accept a reopened case.

At most, plaintiffs' contracts with their insureds have become less profitable (see Raynor, 18 NY3d at 58-59).  When plaintiffs calculated their premiums for pre-2013 policy years,

those premiums did not include the costs of liability on qualifying reopened cases, as those costs would have been borne by the Fund, and their premiums in those previous policy years are therefore now insufficient to cover the costs of their liability.  This risk, however -- that the premium charged in any one policy year will be insufficient to cover the costs of a carrier's liability -- is a risk inherent in the insurance market, especially in a highly regulated market such as workers' compensation insurance, where "[t]he allocation of economic benefits and burdens has always been subject to adjustment" (Becker, 43 NY2d at 541).

Inasmuch as the legislative amendment does not impair any term of plaintiffs' contracts with their insureds, we need not consider whether any impairment is substantial, or whether any substantial impairment is justified by a "significant and legitimate public purpose" (Energy Reserves Group, 459 US at 411-412; see General Motors Corp., 503 US at 186-187; Ballentine v Koch, 89 NY2d 51, 60-61 [1996]).

Plaintiffs rely on our decision in Health Insurance Association of America v Harnett (44 NY2d 302 [1978]) to support their Contract Clause claim, but Harnett is distinguishable.  In that case, 1976 legislation mandated "the inclusion of maternity care coverage in health and accident insurance policies issued after January 1, 1977" (id. at 306).  The Court held that the legislation was "not unconstitutional as to its substantive

provisions," inasmuch as it did not violate constitutional due process requirements (see id. at 306, 308-312).

The Court further concluded, however, that the legislature "may not constitutionally require the addition of such coverage to policies in existence before that date but thereafter renewed, if the renewal is at the option of the insured alone without the consent of the insurer" (id. at 306). We reasoned that our prior decision in Moore v Metropolitan Life Insurance Company (33 NY2d 304 [1973]) was dispositive, insofar as the Court held in Moore that "[w]here . . . the insurer does not have the right to terminate the policy or change the premium rate without consent of the [insured], renewal, by the payment of premiums merely continues in force the pre-existing policy, and statutes enacted subsequent to its original enactment cannot be applied'" (Harnett, 44 NY2d at 313, quoting Moore, 33 NY2d at 312). We further concluded that the insurer's right to increase premiums was not sufficient. Rather, "[w]hat is required is a choice open to the insurer to increase premiums or in the alternative, if it so elects, to terminate -- thus, fail to renew -- the policy and escape the added risk imposed by the statutory modification" (Harnett, 44 NY2d at 313).

Harnett is distinguishable from the present case because Harnett involved the legislative addition of maternity coverage to insurance policies that previously included no such coverage. The Court held that this was impermissible to the

extent that the insurer did not have the option to terminate the policy. Here, by contrast, the legislative amendment does not remove, add, or otherwise alter any term of coverage contained within plaintiffs' insurance policies. Plaintiffs' contracts with their insureds obligate plaintiffs to pay any benefits required of their insureds under the workers' compensation law, and the 2013 amendment to section 25-a does not alter those terms. Rather, as explained above, the amendment merely makes plaintiffs' contracts with their insureds less profitable. The decreased profitability of plaintiffs' contracts -- due to the fact that the premiums plaintiffs charged in previous policy years did not account for this subsequent statutory change -- does not constitute an impairment of their contracts with their insureds because it does not alter any term of those contractual provisions (cf. Harnett, 44 NY2d at 313).

To the extent plaintiffs ask us to read the preexisting statutory provisions regarding the Fund's existence as implied terms of their contracts with their insureds, we decline to do so. As the Supreme Court has explained, "[f]or the most part, state laws are implied into private contracts regardless of the assent of the parties only when those laws affect the validity, construction, and enforcement of contracts" (General Motors Corp., 503 US at 189). "[C]hanges in [such] laws that make a contract legally enforceable may trigger Contract Clause scrutiny if they impair the obligation of pre-existing contracts, even if

they do not alter any of the contracts' bargained-for terms" (id.).

Here, by contrast, the 2013 amendment to section 25-a "did not change the legal enforceability of the [insurance] contracts," and "[t]he parties still have the same ability to enforce the bargained-for terms of the [insurance] contracts that they did before" the amendment (id. at 190). If, as plaintiffs suggest, we read into their contracts terms that do not exist based on then-existing statutory language, the Contract Clause "would protect against all changes in legislation, regardless of the effect of those changes on bargained-for agreements" (id.). That construction "would severely limit the ability of state legislatures to amend their regulatory legislation. Amendments could not take effect until all existing contracts expired, and parties could evade regulation by entering into long-term contracts" (id.). Furthermore, the contracts at issue in this case expressly assumed the risk of legislative change.

Inasmuch as the legislature's 2013 amendment to section 25-a did not impair any term of plaintiffs' contracts with their insureds, plaintiffs cannot establish a violation of the Contract Clause.

## B. Takings Clause

The Takings Clause of the Fifth Amendment of the US Constitution, "made applicable to the States through the Fourteenth Amendment, . . . provides that 'private property'

shall not 'be taken for public use, without just compensation'" (Phillips v Washington Legal Foundation, 524 US 156, 163-164 [1998], quoting US Const, 5th Amend).  The New York Constitution similarly provides that "[p]rivate property shall not be taken for public use without just compensation" (NY Const, art I, § 7 [a]).

The threshold step in any Takings Clause analysis is to determine whether a vested property interest has been identified (see Phillips, 524 US at 164; Landgraf, 511 US at 266; Alliance of Am. Insurers v Chu, 77 NY2d 573, 585-587 [1991]).  Plaintiffs concede that the mere obligation to pay money, without identification of a vested property interest, cannot constitute a taking (see James Sq. Assoc. LP v Mullen, 21 NY3d 233, 247 [2013]; see also Swisher Intl., Inc. v Schafer, 550 F3d 1046, 1056 [11th Cir 2008] ["(T)he takings analysis is not an appropriate vehicle to challenge the power of Congress to impose a mere monetary obligation without regard to an identifiable property interest"], cert denied 558 US 932 [2009]).[5]

---

[5]    The Supreme Court's decision in Eastern Enterprises v Apfel (524 US 498 [1998]), upon which the Appellate Division relied in holding that a taking had occurred (see American Economy, 139 AD3d at 146), is not to the contrary.  In Eastern Enterprises, a four-Justice plurality of the Supreme Court concluded that the obligation imposed on Eastern to pay money under the Coal Act constituted a taking because it imposed "severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience" (Eastern Enterprises, 524 US at 528-529; see also id. at 529-537).  Five Justices, however, disagreed with the

Plaintiffs cannot identify any vested property interest impaired by the legislative amendment, and therefore their takings claim must fail.  Plaintiffs assert that they have a constitutionally-protected interest in the value of their contracts with their insureds, and that the diminution in the value of those contracts constitutes a taking.  We disagree.  "As a general matter, the government does not 'take' contract rights pertaining to a contract between two private parties simply by engaging in lawful action that affects the value of one of the parties' contract rights" (Palmyra Pacific Seafoods, LLC v United States, 561 F3d 1361, 1365 [Fed Cir 2009], cert denied 559 US 1106 [2010]).

This Court's decision in Alliance of American Insurers v Chu (77 NY2d 573 [1991]) is distinguishable.  In that case, we held that the plaintiff-insurers had a vested property interest in the income produced by a security fund to which the insurers

---

plurality's takings analysis.  Justice Kennedy would have held the Coal Act unconstitutional under the Due Process Clause, and he opined that the plurality's Takings Clause analysis was "incorrect and quite unnecessary for decision of the case" (id. at 539 [Kennedy, J., concurring in the judgment and dissenting in part]).  The four dissenting Justices agreed with Justice Kennedy that the Takings Clause did not apply because no specific property interest had been identified (see id. at 554-556 [Breyer, J., dissenting]).  Subsequent federal decisions wrestling with the import of Eastern Enterprises have largely adopted the view of Justice Kennedy and the dissenting Justices with respect to the Takings Clause analysis (see e.g. West Virginia CWP Fund v Stacy, 671 F3d 378, 386-387 [4th Cir 2011], cert denied 568 US 816 [2012]; Swisher Intl., 550 F3d at 1054-1057).

were statutorily obligated to contribute.  The Court made clear,
however, that it was the statutory language itself that granted
the insurers a vested property interest (see id. at 586-587).
For example, the relevant statutes provided that the fund "'shall
be separate and apart from any other fund and from all other
state moneys, and the faith and credit of the state of New York
is pledged for their safekeeping'" (id. at 579), and that "income
earned on new contributions to the fund would be either returned
to the contributors or credited toward future contributions" (id.
at 580).  The Court concluded that "these provisions obligated
the State to act in good faith with respect to the fund and its
contributors and to ensure that the fund's assets and earnings
would be available for their intended purposes" (id. at 587), and
that "these limitations established by the Legislature dictate
that the contributions made by plaintiffs were not to become
State moneys to do with as it wished" (id. at 588).  The Court
held that the legislature could not thereafter "eliminate the
plaintiffs' rights with respect to contributions already made"
(id. at 589).

Here, by contrast, the "contributions" required to
maintain the Fund were made by employer-insureds, not by the
carriers, inasmuch as the carriers passed through assessments to
their insureds.  More importantly, no statutory language akin to
that at issue in Alliance of American Insurers exists here.  The
statutory language providing that the Fund would accept the costs

of liability on reopened cases under certain specific circumstances did not provide plaintiffs with any vested right in the Fund's continued acceptance of reopened cases. One cannot claim a vested property interest in continuing to receive a statutory benefit unless statutory language clearly granting a vested right, such as that at issue in Alliance of American Insurers, is present (see Roman Catholic Diocese of Albany, N.Y. v New York State Workers' Compensation Bd., 96 AD3d 1288, 1289 [3d Dept 2012]). Instead, plaintiffs must identify a vested property interest and then demonstrate how the legislative amendment adversely impacts that property interest. They cannot do so because, like the "right" at issue in Becker, any "right" that might be recognized here was inchoate and subject to contingencies (see 43 NY2d at 542).

Inasmuch as plaintiffs have not identified a vested property interest adversely impacted by the amendment, their takings claim fails.

### C. Due Process Clause

Finally, we conclude that plaintiffs cannot establish a substantive due process violation. Initially, the parties disagree regarding the standard to be applied to alleged substantive due process violations when retroactive legislation is at issue. Plaintiffs, relying on Alliance of American Insurers, argue that heightened scrutiny must be applied in the context of retroactive legislation, and that the deferential

rational basis standard should be applied only in the context of prospective legislation.

Granted, we stated in Alliance of American Insurers that "where legislation has retroactive effects, judicial review does not end with the inquiry generally applicable to economic regulation, i.e., whether the legislation has a rational basis" (77 NY2d at 586). The cases we relied on for that proposition, however, were themselves relying on the "vested rights doctrine," i.e., the axiom that "the Legislature is not free to impair vested or property rights" (Matter of Hodes v Axelrod, 70 NY2d 364, 370 [1987]; see Matter of Chrysler Props. v Morris, 23 NY2d 515, 518-519 [1969]). As explained, plaintiffs have not identified a vested right here. In any event, we have primarily interpreted Alliance of American Insurers as a Takings case, not a Due Process case (see e.g. Raynor, 18 NY3d at 58; Matter of Walton v New York State Dept. of Correctional Servs., 13 NY3d 475, 489-490 [2009]).

In the context of a substantive due process challenge to retroactive legislation, we apply the same rational basis scrutiny as the Supreme Court. That test requires "a legitimate legislative purpose furthered by rational means" (General Motors Corp., 503 US at 191). Although the justifications that suffice for the prospective nature of a legislative enactment may not suffice for its retroactive nature, the test of due process for retroactive legislation "is met simply by showing that the

retroactive application of the legislation is itself justified by a rational legislative purpose" (Pension Benefit Guar. Corp. v R.A. Gray & Co., 467 US 717, 730 [1984]).

Assuming that the 2013 amendment to section 25-a has some retroactive impact, we conclude that the retroactive impact is justified by a rational legislative purpose (see id.). As the Memorandum in Support indicated, the closure of the Fund was intended to "save New York businesses hundreds of millions of dollars in assessments per year" (Memorandum in Support, 2013-2014 New York State Executive Budget, Public Protection and General Government Article VII Legislation, at 29). Defendants assert that if the Fund was closed only to reopened cases arising from injuries that occurred after the effective date of the legislation, the Fund would have incurred substantial new liabilities for many years, given the duration of many workers' compensation cases. Defendants contend that, during this extended period, the assessments required to maintain the Fund would have continued to increase, and the relief to businesses sought by the legislature would have been indefinitely delayed. This constitutes a sufficient showing "that the retroactive application of the legislation is itself justified by a rational legislative purpose" (Pension Ben. Guar. Corp., 467 US at 730).

Plaintiffs assert that the statement in the Memorandum in Support -- that the premiums carriers charged already cover this liability -- was incorrect, and that our due process

analysis should end there.  This argument misunderstands the
nature of a due process inquiry.  "A challenged statute will
survive rational basis review so long as it is rationally related
to *any conceivable* legitimate State purpose" (Myers v
Schneiderman, — NY3d —, 2017 NY Slip Op 06412, *5 [2017]
[internal quotation marks omitted] [emphasis added]).

As stated, closing the Fund would save New York
businesses hundreds of millions of dollars in assessments every
year.  In addition, the parties agree that claims on reopened
cases can be administered more efficiently by insurance
carriers.[6]  Delaying the Fund's closure so that it could pay
benefits on every qualifying reopened case arising from an injury
occurring before the amendment's 2013 effective date would have
delayed this intended legislative benefit to New York businesses
and employers for years, if not decades.  We therefore conclude
that any retroactive impact of the legislation is justified by a
rational legislative purpose (see Pension Ben. Guar. Corp., 467
US at 730).  Plaintiffs therefore cannot establish a substantive

---

[6]      The savings to New York employers in the form of
reduced and eventually eliminated assessments required to
maintain the Fund would be offset, to some degree, by increased
workers' compensation insurance premiums.  Nevertheless, the
parties and the amici curiae agree that the net result would be
savings to New York businesses, inasmuch as carriers can
administer claims on reopened cases more efficiently than the
Fund.  Furthermore, the Fund's closure would eliminate litigation
over whether reopened cases qualified for transfer to the Fund,
certainly a source of inefficiency in the administration of
reopened cases.

due process violation.

Accordingly, the order of the Appellate Division should
be reversed, without costs, and judgment granted in favor of
defendants declaring that Workers' Compensation Law § 25-a (1-a)
as applied to policies issued before October 1, 2013 is not
unconstitutional.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order reversed, without costs, and judgment granted in favor of
defendants declaring that Workers' Compensation Law § 25-a (1-a)
as applied to policies issued before October 1, 2013 is not
unconstitutional.  Opinion by Judge Fahey.  Chief Judge DiFiore
and Judges Rivera, Stein, Garcia, Wilson and Feinman concur.

Decided October 24, 2017