MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2025 ME 82
Docket:      Ken-25-53
Argued:      July 15, 2025
Decided:     August 26, 2025

Panel:       STANFILL, C.J., and MEAD, HORTON, LAWRENCE, and DOUGLAS, JJ.

MAINE STATE CHAMBER OF COMMERCE et al.

v.

DEPARTMENT OF LABOR et al.

MEAD, J.

[¶1]  This case is before us on report from the Superior Court (Kennebec County, *Daniel Mitchell, J.*) pursuant to M.R. App. P. 24(a).  The report submits three questions of law regarding the legality and constitutionality of rules promulgated by the Maine Department of Labor in administering the Paid Family and Medical Leave Act, P.L. 2023, ch. 412, § AAA-7 (effective Oct. 25, 2023) (codified as subsequently amended at 26 M.R.S. §§ 850-A to 850-R (2025)), which established a Paid Family and Medical Leave (PFML) program. We accept the report and determine that the Department's rules do not conflict with the Act and do not constitute a taking of private property for public use under either the Maine Constitution or the United States Constitution.

## I. BACKGROUND

[¶2]   The facts are drawn from an agreed statement of facts and five exhibits submitted by the parties as part of the consented-to motion to report to the Law Court.  *See Payne v. Sec'y of State*, 2020 ME 110, ¶ 4, 237 A.3d 870.

[¶3]  In 2023, the Legislature enacted the PFML program.  *See* 26 M.R.S. §§ 850-A to 850-R.  Starting May 1, 2026, the Act allows a covered individual to take up to twelve weeks of leave from their employment for certain qualifying reasons.  *Id.* §§ 850-B(2), 850-P.   The PFML program pays the covered individual through a state-run fund that accumulates deposits, called "contributions," "premiums," or "premium contributions," made into the fund by employers[1] and self-employed individuals who elect to be covered by the program.  *See id.* § 850-A(7) (defining "contributions" as "the payments remitted by an employer or self-employed individual to the fund, as required by this subchapter"); *id.* § 850-F (requiring that employers and self-employed individuals pay "premiums" or "premium contributions" and requiring employers to remit "employer contribution reports and premiums").  Maine

---

[1]  The starting premium is 1% of wages.  26 M.R.S. § 850-F(3)(A).  An employer with 15 or more employees may deduct up to half of the premium attributable to an employee from the employee's wages and must remit to the Department the entire premium.  *Id.* § 850-F(5)(A).  An employer with fewer than 15 employees must remit to the Department an amount equal to half of the premium and may deduct from an employee's wages all of the premium remitted.  *Id.* § 805-F(5)(B).  For ease of discussion, this opinion will describe all premiums as being paid by the employer.

businesses were required to start remitting quarterly premiums into the fund on January 1, 2025. *Id.* § 850-F(2).

[¶4]    The PFML program allows private employers to apply to the Department to substitute an approved private plan for the PFML program. *Id.* § 850-H(1). The statute clarifies that "[i]n order to be approved, a private plan must confer rights, protections and benefits substantially equivalent to those provided to employees under this subchapter [26 M.R.S. §§ 850-A to 850-R]." *Id.* If a private employer substitutes a private plan for the PFML program, the employer "is not required to remit premiums . . . to the fund." *Id.* § 850-F(8).

[¶5]  Sections 850-H(8) and 850-Q direct the Department to adopt rules to implement the PFML program by January 1, 2025. Throughout 2024, the Department engaged in a rulemaking process. After two rounds of comments, the Department finalized its rules on December 4, 2024, and the rules took effect on January 1, 2025. *See* 12-702 C.M.R. ch. 1 (effective Jan. 1, 2025).

[¶6]  At issue in this case are the Department's promulgated rules related to premiums and the substitution of private plans for the program. The PFML program and the Department's rules required all employers to begin remitting premiums into the fund in January 2025. 26 M.R.S. § 850-F(2); 12-702 C.M.R. ch. 1, § X(B). Rule 12-702 C.M.R. ch. 1, § XIII(A)(2) allows employers to apply

4

for approval of a private plan after April 1, 2025, which is the first day of the second quarter of 2025. The Department instituted this delay in the interest of administrative feasibility because it was the Department's understanding that it would take insurance companies three to four months after the final rules were issued to write private policies that would satisfy the requirement that the coverage of the private plan be substantially equivalent to the PFML program (the "substantial-equivalence requirement"). If a private plan is approved, "[t]he exemption from the obligation to pay premiums begins on the first day of the quarter in which the substitution is approved." *Id.* § XIII(A)(4). The rules clarify that "[t]he employer is responsible for premiums provided under the Act and this rule until the effective date of [the] exemption[,] and premiums owed prior to the effective date of [the] exemption must be remitted and are non-refundable." *Id.* § XIII(A)(4)(b). The Department explained in a response to comments that this component of the application process "was developed balancing the interest of employers and the interest of establishing a fiscally sound Paid Family and Medical Leave Fund."

[¶7] Following the adoption of the rules, insurers began writing policies that would satisfy the substantial-equivalence requirement and, if approved, would allow private employers to quickly substitute a pre-approved private

plan for the PFML program. *See id.* § XIII(D). The Maine Bureau of Insurance and the Department would then review these policies, which were expected to be approved by April 1, 2025. Fourteen insurance companies submitted proposed private plans to the Bureau and Department for review. Starting on April 1, 2025, employers began to apply to the Department to offer substitute plans using pre-approved private plans.[2] Since January 2025, employers have been remitting premiums to the fund.[3]

[¶8] On January 13, 2025, the Maine State Chamber of Commerce and Bath Iron Works (BIW) brought a complaint against the Department and its Commissioner, Laura A. Fortman, to challenge 12-702 C.M.R. ch. 1, § XIII(A)(4)(b). Both plaintiffs sought relief pursuant to 5 M.R.S. § 8058(1) (2025) to have the regulation declared invalid. BIW, individually, brought several claims: (a) a claim pursuant to M.R. Civ. P. 80C and 5 M.R.S. §§ 11001-11008 (2025) for a "judgment that 12-702 C.M.R. ch. 1,

---

[2] The parties dispute the nature of the Department's approval of employers' applications for pre-approved substitute private plans. The plaintiffs describe the Department's approval as a mere formality. The Department acknowledges that the approval of pre-approved substitute private plans will be "fairly streamlined," but contends that section 850-H of the Act requires the Department to independently review applications to substitute private plans and that those approvals are not automatic.

[3] At the time of the consented-to motion to report the questions to the us, Bath Iron Works estimated that it would remit approximately $620,000 in nonrefundable premiums for the first quarter of 2025.

6

§ XIII(A)(4)(b) is null and void on the basis that it violates the governing statutory provision and thwarts the Legislature's intent in establishing the PFML"; (b) a claim under 42 U.S.C.A. § 1983 (Westlaw through Pub. L. No. 119-33), contending that the Department's regulations violated its Fifth Amendment right against unconstitutional takings; and (c) a claim seeking compensation on the ground that the rule is an inverse condemnation that violates article I, § 21 of the Maine Constitution.

[¶9] On February 5, 2025, the plaintiffs filed a consented-to motion to report questions to the Law Court pursuant to M.R. App. P. 24(a) with an agreed-upon statement of facts and exhibits. The questions presented were the following:

> (I) Have Plaintiffs proven, on the stipulated record, pursuant to 5 M.R.S. § 8058 (2025) that 12-702 C.M.R. ch. 1, § XIII(A)(4)(b) conflicts with the Paid Family Medical Leave Act, 26 M.R.S. §§ 850A-850-R (2025), or that 12-702 C.M.R. ch. 1, § XIII(A)(4)(b) is arbitrary and capricious or otherwise not in accordance with law?

> (II) Have Plaintiffs proven, on the stipulated record, that 12-702 C.M.R. ch. 1, § XIII(A)(4)(b) constitutes a cognizable claim of taking of private property for public use, without just compensation, in violation of article I, section 21 of the Maine Constitution?

> (III) Have Plaintiffs proven, on the stipulated record, that 12-702 C.M.R. ch. 1, § XIII(A)(4)(b) constitutes a cognizable claim of taking of private property for public use, without just compensation, in

violation of the Fifth Amendment of the United States Constitution, made applicable to the States through the Fourteenth Amendment?

The court issued an order in which it determined that the three questions presented were of "substantial importance not only to the parties but also other members of the public" and reported the questions to us.

## II. DISCUSSION

### A.    Reported Questions

[¶10]  We begin by addressing issues inherent in the vehicle by which this matter reaches us—a report pursuant to M.R. App. P. 24(a).[4]  Because Rule 24 exists as an exception to the final judgment rule and should be used sparingly, *see Liberty Ins. Underwriters v. Est. of Faulkner*, 2008 ME 149, ¶ 5, 957 A.2d 94, we must "independently determine whether acceptance of the report is consistent with our basic function as an appellate court or would improperly place us in the role of an advisory board due to the lack of a final trial court

---

[4] Maine Rule of Appellate Procedure 24(a) provides,

**(a) Report by Agreement of Important or Doubtful Questions.** When the trial court is of the opinion that a question of law presented to it is of sufficient importance or doubt to justify a report to the Law Court for determination, it may so report when:

(1) all parties appearing agree to the report;

(2) there is agreement as to all facts material to the appeal; and

(3) the decision thereon would, in at least one alternative, finally dispose of the action.

judgment to review." *Me. Senate v. Sec'y of State*, 2018 ME 52, ¶ 14, 183 A.3d 749. We consider the following factors in determining whether to accept a report: "(1) whether the question reported is of sufficient importance and doubt to outweigh the policy against piecemeal litigation; (2) whether the question might not have to be decided because of other possible dispositions; and (3) whether a decision on the issue would, in at least one alternative, dispose of the action." *Conservatorship of Emma*, 2017 ME 1, ¶ 7, 153 A.3d 102 (quotation marks omitted); *see id.* ¶¶ 5, 8-13 (determining that all three factors militated against accepting the reported questions related to the availability of court records and docket information in electronic format because it was a question of policy that could be answered through a rulemaking or statutory amendment, it would not dispose of the action, and the issue may have been moot because of independent legal authority).

[¶11] Here, the conditions specified in M.R. App. P. 24(a)(1)-(3) are met: the parties agree to the report; there is agreement as to all material facts; and a decision would, in at least one alternative, dispose of the action. The questions presented in the report are of sufficient importance to meet Rule 24(a)'s standard because a determination of any of these questions affects any Maine business that intends to provide a substitute plan, implicates the validity of a

major statewide benefits program that is in the process of being implemented, and could affect the ability of the Department to fund the PFML program. Accordingly, we accept the reported questions.

**B.   Question I**

[¶12]   The first reported question asks whether the Department has exceeded its statutory authority by promulgating rules that are contrary to law.

[¶13]   "State agencies may exercise only that power which is conferred upon them by law." *Molasses Pond Lake Ass'n v. Soil & Water Conservation Comm'n*, 534 A.2d 679, 681 (Me. 1987).   "Under an enabling statute, a public body or a state agency may employ powers that are expressly granted, powers that are reasonably inferred from powers expressly granted, and powers that are essential to give effect to powers expressly granted." *Calnan v. Hurley*, 2024 ME 30, ¶ 9, 314 A.3d 267 (quotation marks omitted).   An agency rule that conflicts with the language of the statute exceeds the statutory authority of the agency.  *See Lydon v. Sprinkler Servs.*, 2004 ME 16, ¶ 15, 841 A.2d 793.  Title 5 M.R.S. § 8058(1) provides a three-part analysis by which we assess whether a rule is valid:

> First, if we find that a rule exceeds the rule-making authority of the agency or is void for the agency's failure to follow the procedural processes of the Maine Administrative Procedure Act, we must declare the rule invalid.  Second, we review any other alleged

procedural errors, and we may invalidate the rule only if we find the error to be substantial and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if the error had not occurred. Finally, if a procedural error does not invalidate the rule, we review the rule substantively to determine whether the rule is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.

*Bocko v. Univ. of Me. Sys.*, 2024 ME 8, ¶ 26, 308 A.3d 203 (alterations, citations, and quotation marks omitted).

[¶14] We employ a two-part analysis when we review an agency's interpretation of a statute it administers. *See Calnan*, 2024 ME 30, ¶ 11, 314 A.3d 267. "If the statute is unambiguous, we give effect to the plain meaning of the statute." *Id.* If the statute is ambiguous, we determine whether the agency's interpretation was reasonable and defer to that interpretation so long as it is within the agency's expertise. *See id.*

[¶15] The relevant statutory provisions are as follows: Section 850-F(2) provides, "Beginning January 1, 2025, for each employee, an employer shall remit employer contribution reports and premiums in the form and manner determined by the administrator." The same section later provides, "An employer with an approved private plan under section 850-H is not required to remit premiums under this section to the fund." 26 M.R.S. § 850-F(8). Section 850-H(1) clarifies, "In order to be approved, a private plan must confer

rights, protections and benefits substantially equivalent to those provided to employees" under the program. Finally, the Legislature gave the Department until January 1, 2025, to "adopt rules as necessary to implement" the PFML program. *Id.* § 850-Q.

[¶16]   The Act's plain language does not exempt employers from remitting premiums until the Department approves a substitute private plan. Thus, section 850-F(8) creates a forward-looking, prospective exemption that was not intended to start immediately on January 1, 2025. The Legislature gave the Department until January 1, 2025, to adopt rules related to substitute private plans. The use of this date—which is when employers were required to start remitting premiums as well as the latest that the Department could adopt rules—supports the idea that the Legislature recognized that there would inevitably be some gap between when employers were required to start remitting premiums into the fund and when employers obtained approvals for private plans. The language "[i]n order to be approved" in section 850-H(1) indicates that the statute requires the Department to undertake an independent review of each private plan. Because this review process is not automatic and immediate, the statute plainly contemplates some period when all employers are required to remit premiums into the fund.

12

[¶17]   Using this statutory framework, the Department adopted the following rules (among others): (1) an employer, regardless of whether it takes all steps to apply and fully intends to provide substitute a private plan, is required to pay nonrefundable premiums until the effective date of exemption, *see* 12-702 C.M.R ch. 1, § XIII(A)(4)(b); (2) the exemption from the obligation to pay premiums begins on the first day of the quarter in which the substitution is approved, *id.* § XIII(A)(4); and (3) an employer may not apply to the Department to substitute a private plan until after April 1, 2025, which corresponds with the start of the second quarter of 2025, *see id.* § XIII(A)(2). As a result, these regulations work together to require all employers to pay nonrefundable premiums into the fund for the first quarter of 2025.

[¶18]  Accordingly, the Department did not exceed its statutory authority and did not promulgate rules that are contrary to law.  *See* 26 M.R.S. § 850-Q. The statute is unambiguous regarding whether the Department can require an employer to remit nonrefundable premiums into the fund while also delaying it from applying to substitute a private plan until the start of the second quarter of 2025.

[¶19]   Requiring an employer to begin remitting nonrefundable premiums into the fund in January 2025 is consistent with 26 M.R.S

§ 850-F(2)'s requirement that starting on January 1, 2025, "an employer shall remit . . . premiums in the form and manner determined by the administrator." Nothing in the statute mandates or even anticipates refunds for employers that eventually obtain an exemption from the requirement to remit premiums.

[¶20]    Furthermore, the Department's nonrefundable-premium rule reasonably furthers the Legislature's directive to implement and develop a fiscally sound fund.  *See id.* § 850-P ("[T]he authority shall conduct an actuarial study to ensure the solvency of the fund. . . .").  Based on the experience of other states in implementing programs for paid family and medical leave, the Department was concerned about employers committing to substitute plans through "declarations of intent" or otherwise avoiding remitting premiums during the lead-up period and jeopardizing the solvency of the fund.  By clarifying that the premiums are nonrefundable, the DOL reasonably avoided this problem and furthered its legitimate interest in rolling out a fiscally sound fund.

[¶21]    In addition, the Department's rule delaying employers from applying until after April 1, 2025, for substitute private plans, 12-702 C.M.R ch. 1, § XIII(A)(2), was the product of reasonable administrative considerations. Based on representations from the insurance industry, the Department

determined that it would take several months for the insurance industry to study the rules, draft coverage policies, and submit to the Bureau and Department for preapproval plans that were substantially equivalent to the PFML program. The PFML program is structured using a system of quarterly premium payments, *see id.* § 850-F(2) ("Employer contribution reports and premiums must be remitted quarterly."), and therefore the Department reasonably designated April 1, 2025, the start of the second quarter of 2025, as the date on which exemptions would begin, which created only a small window of time before the exemption process was rolled out. Further, by selecting this date, the Department avoided administrative problems related to employers applying for the exemption before private substitute plans had been pre-approved.

[¶22] Finally, the rules allowing employers with approved private plans to cease paying premiums into the fund as early as April 1, 2025, despite the fact that coverage will not be available until 2026, inures to the benefit of those employers. All other employers must pay premiums into the fund for *all* of 2025, even though the coverage under the PFML program will not start until 2026.

[¶23]  We conclude that the rules do not conflict with the Act.  The Department's rules reasonably implement the PFML program and the exemption for private substitute plans.  Accordingly, the Department did not exceed its statutory authority.  *See* 5 M.R.S. § 8058.  The plaintiffs raise no other argument to suggest that there was some procedural error or that the rule is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law," and, in any event, we conclude that it is not.  *See Bocko*, 2024 ME 8, ¶ 32, 308 A.3d 203.

## C.    Questions II and III

[¶24]  The second and third questions ask whether the Department violated article I, § 21 of the Maine Constitution or the Fifth and Fourteenth Amendments to the United States Constitution by adopting rules that constitute a taking of property for a public purpose without providing just compensation.

[¶25]  "The party challenging [a] regulation bears the heavy burden of overcoming [the] presumption of constitutionality."  *Davis v. Sec'y of State*, 577 A.2d 338, 341 (Me. 1990).  The final clause of the Fifth Amendment provides, "[N]or shall private property be taken for public use, without just compensation."  U.S. Const. amend. V.  Similarly, the Maine Constitution provides that "[p]rivate property shall not be taken for public uses without just

compensation; nor unless the public exigencies require it." Me. Const. art. I, § 21.

[¶26]  A regulation that "'goes too far'" in adversely affecting a private property interest "'will be recognized as a taking.'" *MC Assocs. v. Town of Cape Elizabeth*, 2001 ME 89, ¶ 4, 773 A.2d 439 (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)).  Whether a regulation has gone too far "depends largely 'upon the circumstances of the case,'" considering factors such as "'the economic impact of the regulation on the claimant, the extent to which the regulation has interfered with distinct investment-backed expectations, and the character of the governmental action.'" *Id.* ¶ 5 (quoting *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124 (1978) (alterations, ellipses, and quotation marks omitted)).  Impermissible regulatory takings can occur for both tangible and intangible property, and a tax or fee can constitute a regulatory taking under some circumstances.  *See Me. Beer & Wine Wholesalers Ass'n v. State*, 619 A.2d 94, 97 (Me. 1993); *Tyler v. Hennepin Cnty., Minn.*, 598 U.S. 631, 639 (2023); *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 613 (2013).

### 1.     Voluntary Participation

[¶27]  No regulatory taking occurs when a property owner voluntarily participates in a regulated program.  *See Yee v. City of Escondido*, 503 U.S. 519, 527-28 (1992) (holding that a rent-control ordinance did not constitute a taking because the land owners voluntarily rented their land to tenants); *Garelick v. Sullivan*, 987 F.2d 913, 916-17 (2d Cir. 1993) (holding that a law that limited the amount physicians could charge to Medicare beneficiaries under a certain program was not a taking because the physicians opted to provide services to Medicare beneficiaries).

[¶28]  Here, the Legislature developed the PFML program to ensure that all employees in Maine can obtain PFML benefits.  *See* 26 M.R.S. §§ 850-B, 850-F(2).    The Legislature then gave employers the option, and the corresponding burden, to apply to substitute a private plan.  *See id.* §§ 850-F(8), 850-H(1).  This policy structure confirms that an employer's use of a substitute private plan is fully voluntary.

[¶29]  Section 850-F(8) of the Act explicitly exempts employers with approved private plans from remitting premiums but says nothing about employers that have not been approved.  Although the employees of BIW may never directly benefit from BIW's premium payments given the approval of

BIW's private plan, the Department initially assumes that every employer will participate in the statutory PFML program. This administrative presumption is consistent with the Act's plain language. The Department reasonably determined that it cannot administer the PFML program based on an assumption that every employer that intends to apply to substitute a private plan will actually do so or that every application will be approved. Furthermore, the rule is rationally related to the Department's goals of ensuring an administratively smooth implementation of the PFML program and that the PFML fund is solvent. *See Me. Beer & Wine Wholesalers Ass'n*, 619 A.2d at 99 ("[G]overnment regulation that exacts costs from private business is permissible as long as it is a reasonable use of the state's police power. Reasonableness . . . requires that the purpose of the enactment be in the interest of the public welfare and that the methods utilized bear a rational relationship to the intended goals." (citation omitted)).

## 2. Property Interest

[¶30] Furthermore, a regulation is subject to a Takings Clause analysis only if a specific, identifiable property right or interest is at stake. *See id.* at 97-98; *E. Enters. v. Apfel*, 524 U.S. 498, 541-42 (1998) (Kennedy, J., concurring). Thus, "a Takings Clause issue can arise only after a plaintiff's property right has

been independently established." *Parella v. Ret. Bd. of R.I. Emps.' Ret. Sys.*, 173 F.3d 46, 58 (1st Cir. 1999). Therefore, the mere "imposition of an obligation to pay money" does not constitute an unconstitutional taking of property when it does not involve an identifiable property interest. *See Commonwealth Edison Co. v. U.S.*, 271 F.3d 1327, 1340 (Fed. Cir. 2001); *Swisher Int'l, Inc. v. Schafer*, 550 F.3d 1046, 1054-1055 (11th Cir. 2008) (concluding that imposing an obligation to contribute to a fund that would buy out tobacco farmers did not constitute an unconstitutional taking). In *Eastern Enterprises v. Apfel*, five justices of the U.S. Supreme Court agreed that no unconstitutional taking occurred when Congress required an employer to pay health care premiums for retired miners who had previously worked for the employer when it was in the coal business. 524 U.S. at 540 (concurring and dissenting opinions). Justice Kennedy reasoned that the legislation "does not appropriate, transfer, or encumber an estate in land (*e.g.* a lien on a particular piece of property), a valuable interest in an intangible (*e.g.* intellectual property), or even a bank account or accrued interest. The law simply imposes an obligation to perform an act, the payment of benefits." *Id.*

[¶31] Here, there is no identifiable property right or interest at stake that could form the basis of a takings claim. The statute and rules merely impose an

obligation to pay premiums into a fund that exists wholly separate from the public fisc.  Moreover, that an employer can substitute a private plan for the PFML program does not create a corresponding property right in premiums that have already been remitted to the fund, particularly when employers who are not substituting a private plan must also remit premiums for the same period.

[¶32]  Accordingly, we answer questions II and III in the negative and conclude that the Department's rule requiring employers to pay nonrefundable premiums into the fund does not result in a cognizable takings claim under either the Maine or the U.S. Constitution.

The entry is:

> Report accepted.  We answer each of the three questions presented in the negative.  Remanded to the Superior Court for further proceedings consistent with this opinion.

---

Joshua D. Dunlap, Esq., Sara A. Murphy, Esq. (orally), and Katherine E. Cleary, Esq., Pierce Atwood LLP, Portland, for appellants Maine State Chamber of Commerce and Bath Iron Works Corporation

Aaron M. Frey, Attorney General, Nancy Macirowski, Asst. Atty. Gen. (orally), and Anne Macri, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellees Department of Labor and Laura A. Fortman

Laura H. White, Esq., White & Quinlan, LLC, Kennebunk, for amici curiae A Better Balance, National Partnership for Women & Families, and Maine Employment Lawyers Association

Gerald F. Petruccelli, Esq., and Scott D. Dolan, Esq., Petruccelli, Martin & Haddow, LLP, Portland, for amici curiae The Cianbro Companies, The Jackson Laboratory, Maine Bankers Association, Maine Employers' Mutual Insurance Company, Maine Independent Colleges Association, Northern Light Health, and The Sheridan Corporation

Kennebec County Superior Court docket number CV-2025-7
FOR CLERK REFERENCE ONLY